IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, THE STATES OF CALIFORNIA, COLORADO, FLORIDA, GEORGIA, HAWAII, INDIANA, MICHIGAN, NEVADA, NEW MEXICO, NORTH CAROLINA, RHODE ISLAND, TENNESSEE, TEXAS, WASHINGTON, THE COMMONWEALTH OF MASSACHUSETTS,  and THE COMMONWEALTH OF VIRGINIA *ex rel.* ROBIN KNIGHT and SHARI HAGEN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs-Relators, | ) | Civil Action No. |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| LIFE CARE CENTERS OF AMERICA, INC., AFFILIATED ENTITIES OF LIFE CARE CENTERS OF AMERICA, INC. TO BE NAMED, OMNICARE, INC., AFFILIATED ENTITIES OF OMNICARE, INC. TO BE NAMED, and FORREST PRESTION, | ) ) ) ) ) ) ) | **FILED IN CAMERA AND UNDER SEAL** |
| Defendants. | ) ) ) |  |

## COMPLAINT

As "opioids" destroy lives while generating profits for others who promote their use, this action seeks to stop the Defendants' dangerous business practices that

1

produce opioid addiction among certain nursing home patients, that place profits above nursing home residents' medical needs, and that result in loss of public tax dollars.

Relators Shari Hagen and Robin Knight ("Relators") bring this action under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*., and the state false claims acts cited below, on behalf of themselves and the United States of America ("United States") and the States identified herein (collectively referred to as the "STATES"), against Life Care Centers of America, Inc. and its affiliated entities to be named (collectively referred to as "Life Care"); Forrest Preston ("Preston"), as the alter ego of Life Care; and Omnicare, Inc. and its affiliated entities to be named (collectively referred to as "Omnicare") (hereinafter, all Defendants referred to as "Defendants"), for knowingly submitting and/or causing to be submitted false claims for reimbursement to Medicare, Medicaid (including but not limited to TennCare), TRICARE/CHAMPUS, and other federal and state health care programs (collectively "Federal and State Health Care Programs").[1] As described below, Defendants also engaged in violations of the False Claims Act by knowingly making, using, or causing to be made or used, false records or statements material

---

[1] Throughout this Complaint, these terms may be used interchangeably, including: "federal health care programs," "federal and state health care programs," and "Medicare," "Medicaid," and "TRICARE." All are included within the term, "Federal and State Health Care Programs."

to false or fraudulent claims to Federal and State Health Care Programs, and in the other ways described herein. This action seeks to recover treble damages, civil penalties, and other relief.

For their Complaint, Relators allege:

## I.     **INTRODUCTION**

1.     This *qui tam* action is brought against Defendants Life Care, Preston, and Omnicare for violating the False Claims Act and the various state false claims acts cited below, in connection with claims for reimbursement to Federal and State Health Care Programs for:

a.   Over-prescribing and over-dispensing dangerous opioid drugs to nursing home patients, specifically narcotic opioids listed in Schedule II of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.* ("CSA"), that were not medically necessary, that were harmful to nursing home patients, and that were prescribed and dispensed without a legitimate medical purpose, in violation of the CSA, Medicare regulations, and the FCA;

b.   Requiring patients, *even dying patients,* to undergo excessive and unnecessary physical therapy, speech therapy, and/or occupational therapy, so that Life Care and Preston might wrongfully maximize billings to Federal and State Health Care Programs, in an apparent

3

continuation of past abuses of nursing home residents and Federal and State Health Care Programs by Life Care; and

    c. Various other systematic failures to provide the care that Federal and State Health Care Programs have paid Life Care to provide to nursing home residents.

2. As to the over-prescribing and over-dispensing of opioid drugs, Schedule II drugs, such as oxycodone and hydrocodone, have a high potential for abuse and can cause significant harm if used improperly. For this reason, both Life Care and Omnicare (which provides the pharmacy services at issue) are required to ensure that these drugs are medically necessary, are prescribed and dispensed for a legitimate medical purpose, and are appropriate in form, strength, and quantity for Life Care residents.

3. Opioid misuse among older Americans has become an increasingly urgent public health concern. Nonetheless, Life Care and Omnicare, acting in concert with each other, and in abdication of their respective statutory and regulatory duties to ensure that Life Care residents receive medically appropriate drugs in the appropriate amounts and for appropriate durations, have knowingly and purposefully over-prescribed and/or overly-dispensed unnecessary opioids to Life Care residents. The wrongful conduct of each Defendant has violated the False Claims Act as described herein.

4

4.     Specifically, Defendant Life Care owns and/or operates skilled nursing facilities throughout the country.  With the active participation of Omnicare, Life Care has knowingly and repeatedly over-prescribed and over-administered Schedule II controlled substances to Life Care patients that were not medically necessary and that were not for a legitimate medical purpose, while falsely certifying compliance with the requirements of Federal and State Health Care Programs, including compliance with state and federal laws and regulations.

5.     Defendant Omnicare, through arrangements with Life Care, provides dispensing and consulting pharmacy services at Life Care's facilities.  Acting in concert with Life Care, Omnicare has routinely filled opioid prescriptions it knew or should have known were excessive, invalid, and non-reimbursable, in violation of the requirements of Federal and State Health Care Programs.

6.     Defendants Life Care and Omnicare have contributed to the nationwide opioid epidemic by repeatedly prescribing and dispensing medically unnecessary opioids to Life Care residents, in their pursuit of profits. These highly addictive narcotic opioids were prescribed for excessive durations, without adequate indications for their use, without a legitimate medical purpose, and often in the presence of adverse consequences.

7.     This *qui tam* action is also brought against Defendant Life Care for violations of the False Claims Act in connection with knowingly submitting and

causing the submission of claims for reimbursement to Federal and State Health Care Programs for (a) medically unnecessary therapy services; (b) therapy services that were excessive in duration, frequency, and intensity; and (c) services that were not rendered or that were materially deficient, worthless, and/or harmful to patients, while falsely certifying compliance with requirements of Federal and State Health Care Programs.

8. Specifically, Defendant Life Care engaged in a scheme to defraud, and has in fact defrauded, the United States by

(a) routinely and knowingly requiring its therapists to perform unnecessary physical, occupational, and speech-language therapy on Life Care patients and residents for the sole purpose of (i) increasing total minutes of therapy, thereby increasing the per diem rates paid by Medicare for services provided to Part A beneficiaries, and (ii) increasing total units of therapy, thereby increasing reimbursements from Medicare for services provided to Part B beneficiaries; and

(b) knowingly submitting and causing the submission of false claims to Medicare for services that were not rendered or that were materially deficient, worthless, and/or harmful to patients, and/or that failed to meet professionally recognized standards for health care.

6

9.     Further, Defendant Life Care has violated the False Claims Act in connection with various other systematic failures to provide the care that Federal and State Health Care Programs have paid Life Care to provide to nursing home residents, as described below.

10.     Through these practices, Defendants have violated the False Claims Act and the state false claims acts in question.

11.     Relators are the original source of the facts and information contained in this Complaint and voluntarily provided that information to the federal and state Governments prior to filing this action.

## II.     <u>JURISDICTION AND VENUE</u>

12.     This Court has jurisdiction under 31 U.S.C. § 3730, and 28 U.S.C. §§ 1331 and 1345.  The Court may exercise personal jurisdiction over Life Care, Omnicare, and Preston because the Defendants reside and/or transact business in this District, and/or committed proscribed acts in this District.  In addition, the claims at issue include TennCare claims submitted for payment within this District.

13.     Venue lies in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), as the place where Defendants reside and where a substantial part of the events or omissions giving rise to the claims occurred.

## III.    PARTIES

14.    Relator Robin Knight has been a nurse for nearly 30 years and has been employed as a floor nurse at Life Care Center of Hixon ("LCCH") since March 2018. LCCH, a 108-bed skilled nursing facility located at 5798 Hixson Home Place, Hixson, TN 37343, is owned and operated by Defendant Life Care and provides short-term rehabilitation, long-term care, and post-operative recovery, with a focus on physical, occupational, and speech therapy on an inpatient and outpatient basis.

15.    Relator Shari Hagen has been a licensed practical nurse (LPN) since 1990 and has been employed as a floor nurse at LCCH since January 7, 2016.

16.    Defendant Life Care is headquartered in Cleveland, Tennessee.  Life Care is a for-profit corporation that manages and/or owns over 200 assisted and independent living facilities, retirement centers, and skilled nursing facilities in 28 states, including over 20 facilities in Tennessee.

17.    Defendant Forrest Preston is the founder, sole shareholder, and Chairman of the Board of Life Care Centers of America.

18.    Omnicare is a for-profit Delaware corporation with its principal place of business in Cincinnati, Ohio.

19.    In or around 1999, Omnicare acquired substantially all of the assets of Life Care Pharmacy Services, Inc., a multistate provider of institutional pharmacy services owned by Forrest Preston.

8

20. In 2005, Omnicare acquired NeighborCare, Inc., an institutional pharmacy provider that provided pharmaceutical services to long term care facilities, skilled nursing facilities, specialty hospitals, assisted and independent living communities, and other assorted group settings, in 34 states and the District of Columbia

21. Omnicare is currently the nation's largest provider of pharmaceutical services to post-acute facilities and long-term care facilities, including nursing homes, skilled nursing facilities, and assisted living institutions. Through arrangements with these facilities, including Life Care's skilled nursing facilities, Omnicare services approximately 1,000,000 beds and dispenses more than 70 million prescriptions a year to skilled nursing facility customers in 47 states, including Tennessee, and the District of Columbia from approximately 170 pharmacy locations. Omnicare employs approximately 12,000 individuals throughout all pharmacy locations and corporate offices. As a provider of institutional pharmacy services to residents in Life Care's facilities, Omnicare fills prescriptions and submits claims to and receives reimbursement from federal and state health care programs such as Medicaid and Medicare Part D.

22. Omnicare was acquired by CVS Pharmacy, a wholly owned subsidiary of CVS Health, on August 18, 2015. CVS's long-term care segment still operates under the Omnicare and Neighborcare names.

9

# IV.  APPLICABLE LAW

## A.  The False Claims Act

23.     The FCA provides, in pertinent part, that any person who:

(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property; [or]

* * * *

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation

10

Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C.A. § 3729 (West).

24.     The FCA further provides that a person acts "knowingly" if he or she, with respect to information, (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. No proof of a specific intent to defraud is required. 31 U.S.C. § 3729(b)(1).

**B.     The Controlled Substances Act**

25.     The Controlled Substances Act ("CSA") regulates the prescribing and dispensing of controlled substances and establishes strict standards for both practitioners who prescribe the drugs and pharmacies that dispense them.

26.     The prescribing and dispensing of controlled substances to residents of long-term care facilities must take place in accordance with the CSA.

27.     The CSA organizes controlled substances into five categories, or classification schedules, according to their relative abuse potential, their likelihood of causing dependence when abused, and whether they have a currently accepted medical use in treatment.

28.     Schedule I drugs are those that have the greatest potential for abuse and do not have legitimate medical uses.

11

29.     Schedule II drugs, which include narcotics commonly used to relieve pain, also have a high potential for abuse that may lead to severe psychological or physical dependence. Unlike Schedule I drugs, however, Schedule II drugs have a currently accepted medical use in medical treatment. Schedule II drugs thus have the highest potential for abuse of any prescription drugs legally available in the United States. Schedule II narcotics include: hydromorphone (brand name Dilaudid), methadone (brand name Dolophine), meperidine (brand name Demerol), oxycodone (brand names OxyContin and Percocet), and fentanyl (brand names Sublimaze and Duragesic). Other Schedule II narcotics include: morphine, opium, codeine, and hydrocodone.

30.     Because Schedule II drugs are highly addictive and have a dangerous potential for abuse, the CSA and Drug Enforcement Administration regulations implementing the CSA require that, among other things, every prescription for a Schedule II controlled substance be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. 21 U.S.C. § 829, 21 C.F.R. § 1306.04(a).

31.     Pursuant to 21 C.F.R. § 1306.04(a), to be valid, a prescription for a Schedule II controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." Prescriptions that do not meet these criteria are not prescriptions within the meaning

12

and intent of the CSA and are not eligible for reimbursement by Medicare. 21 C.F.R. § 1306.04(a); 42 C.F.R. § 423.104(h).

32.     Although "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, … a corresponding responsibility rests with the pharmacist who fills the prescription." 21 C.F.R. § 1306.04(a). Accordingly, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) *and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances*." Id. (emphasis supplied).

33.     This "corresponding responsibility" requires pharmacists to exercise sound professional judgment when filling a prescription issued by a physician. In doing so, a pharmacist must make determinations regarding the legitimacy of a controlled substance prescription and must ensure that the prescription is issued (a) for a legitimate medical purpose and (b) by an individual practitioner acting in the usual course of professional practice.  21 C.F.R. § 1306.04(a).

34.     This "corresponding responsibility" thus prohibits a pharmacist from filling a prescription for a controlled substance when he either knows *or has reason to know* that the prescription was not written for a legitimate medical purpose.

13

## C.     The Medicare and Medicaid Programs

35.     Medicare is a federally funded health insurance program that provides health coverage for individuals aged 65 and older and those younger than 65 who have permanent disabilities, including those with end-stage renal disease and amyotrophic lateral sclerosis. The program is administered by the Centers for Medicare and Medicaid Services ("CMS") and consists of four parts, each of which cover different services.

36.     Medicare Part A (hospital insurance) covers inpatient care, including care received while in a hospital, a skilled nursing facility, and, in some circumstances, at home.

37.     Medicare Part B (medical insurance) provides supplemental coverage of medical expenses that are not covered under Part A, including physician and outpatient expenses.

38.     Medicare may not pay for any expense that is not "reasonable and necessary for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A) (Parts A and B).

39.     Medicare Part D, also known as the Medicare prescription drug benefit, is a voluntary outpatient prescription drug benefit for Medicare Part A and Part B enrollees.

40.     Unlike Part A and B benefits, Part D benefits are delivered by private insurance companies, known as Part D Plan Sponsors, who contract with CMS to provide prescription drug coverage for beneficiaries who choose to enroll in the program. Part D Plan Sponsors may offer stand-alone prescription drug plans or prescription drug coverage as a part of a managed care plan, known as a Medicare Advantage Prescription Drug Plan.

41.     Medicaid is a federal health care program that provides health care benefits for certain groups, primarily low-income adults, children, elderly adults, and people with disabilities. It is jointly funded by the states and the federal government and is administered federally by CMS and in each of the states by state Medicaid agencies, according to federal requirements. The federal involvement in Medicaid includes providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

42.     Medicaid provides reimbursement for health care benefits, items, and services, including pharmaceutical drugs and supplies, to participating providers on behalf of its beneficiaries, or directly to its beneficiaries.

43.     As described below, the Medicare and Medicaid programs pay for an array of nursing home services provided to eligible residents on a per diem basis under the so-called prospective payment system (PPS) based on the level of care each resident requires. Statutes and regulations governing the Medicare and

15

Medicaid programs require nursing homes to maintain substantial compliance with the pertinent rules and regulations governing those programs.

### 1. Medicare Requirements for Skilled Nursing Facilities

44. In order to provide services to Medicare beneficiaries and be reimbursed for those services, skilled nursing facilities "must provide services in compliance with all applicable Federal, State, and local laws and regulations and with accepted professional standards and principles which apply to professionals providing services in such … facility[ies]." 42 U.S.C. § 1395i-3(d)(4)(A).

45. Meeting and maintaining applicable state and federal requirements and standards are prerequisite to receiving payment from Medicare.

46. The specific regulations with which a nursing facility must comply to qualify for participation in and thereby receive payment from Medicare are set forth at 42 C.F.R. § 483.1, *et seq*. These requirements "serve as the basis for survey activities for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid." Id. § 483.1(b).

### a. Quality of Life and Quality of Care

47. Both quality of life and quality of care are "fundamental principles" that apply to all treatment, care, and services provided to facility residents. 42 C.F.R. §§ 483.24, 483.25.

16

48. Among other things, SNFs (a) must assure that all services for which they submit claims are "of a quality which meets professionally recognized standards of health care," 42 U.S.C. § 1320c-5(A)(2), and (b) "must care for [their] residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident," id. § 1396r(b)(1)(A).

49. Each resident must also receive, and the facility must provide, the care and services necessary to attain or maintain the highest practicable physical, mental, and psychosocial well-being. 42 U.S.C. § 1396r(b)(2)(A); 42 C.F.R. § 483.24.

**b. Nursing Services**

50. In order to provide the requisite quality of care, nursing facilities are required by Medicare regulations to be adequately staffed with nursing personnel who possess the appropriate competencies and skills to ensure resident safety and to achieve and maintain the highest practicable physical, mental, and psychosocial well-being of each resident. 42 C.F.R. § 483.35.

51. Specifically, SNFs must ensure that there are enough licensed nurses and other nursing personnel, including nurse aids, on a 24-hour basis to provide nursing care to all residents in accordance with resident care plans. SNFs must also ensure that licensed nurses have the specific competencies and skill sets necessary to care for residents' needs. Id. § 483.35(a)(1). See also 42 U.S.C. §§ 1395i-3(b)(4)(C)(i), 1396r(b)(4)(C)(i)(I).

17

52.    Providing care includes but is not limited to assessing, evaluating, planning and implementing resident care plans and responding to resident's needs. 42 C.F.R. § 483.35(a)(4).

### c.    Pain Management

53.    All nursing facilities must ensure that pain management is provided to residents who require such services. 42 C.F.R. § 483.25(k).

54.    The pain management that is provided must, however, be consistent with professional standards of practice, the comprehensive person-centered care plan, and the residents' goals and preferences. Id.

55.    Opioids and other potent analgesics are appropriate "for residents who are actively dying, those with complex pain syndromes, and those with more severe acute or chronic pain that has not responded to non-opioid analgesics or other measures." CMS State Operations Manual, Transmittal 41 (April 10, 2009). When opioids are used to treat pain, they

> should be selected and dosed in accordance with current standards of practice and manufacturers' guidelines in order to optimize their effectiveness and minimize their adverse consequences. Adverse consequences may be especially problematic when the resident is receiving other medications with significant effects on the cardiovascular and central nervous systems. Therefore, careful titration of dosages based on monitoring/evaluating the effectiveness of the medication and the occurrence of adverse consequences is necessary. The clinical record should reflect the ongoing communication between the prescriber and the staff is necessary for the optimal and judicious use of pain medications.

Id.

18

56.     A resident's rights with respect to the planning and implementation of his or her care does not include the right to receive medical treatment or medical services that are medically unnecessary or inappropriate. 42 C.F.R. § 483.10(c).

**d.     Pharmacy Services**

57.     In addition to physician, nursing, and rehabilitative services, among others, skilled nursing facilities "must provide pharmaceutical services … to meet the needs of each resident." 42 C.F.R. § 483.45(a).  These services must include procedures that assure the accurate acquiring, receiving, dispensing, and administering of all drugs and biologicals. Id.

58.     To comply with this mandate, SNFs must employ or obtain the services of a licensed pharmacist who, in addition to processing prescriptions and dispensing and delivering medications,

(1) Provides consultation *on all aspects of the provision of pharmacy services* in the facility;

(2) Establishes a system of records of receipt and disposition of all controlled drugs in sufficient detail to enable an accurate reconciliation; and

(3) Determines that drug records are in order and that an account of all controlled drugs is maintained and periodically reconciled.

42 C.F.R. § 483.45(b) (emphasis supplied).

19

59.     These services are generally provided by institutional long-term care (LTC) pharmacies like Omnicare, which contract with the SNFs to provide drugs to SNF residents. Typically, drugs for all residents in the SNF will be provided by one LTC pharmacy.

60.     The LTC pharmacy's pharmacists play a central role in validating, challenging, or adjusting the initial drug selections made by the attending physicians and other health practitioners.

61.     As noted above, a nursing facility has a duty to care for its residents in a way that maintains and enhances their quality of life. This duty includes ensuring that residents do not receive unnecessary drugs. 42 C.F.R. § 483.45(d) ("Each resident's drug regimen … be free from unnecessary drugs.").

62.     An "unnecessary drug" is _any_ drug when used

> (1) In excessive dose (including duplicate drug therapy); or
> (2) For excessive duration; or
> (3) Without adequate monitoring; or
> (4) Without adequate indications for its use; or
> (5) In the presence of adverse consequences which indicate the dose should be reduced or discontinued; or
> (6) Any combinations of the reasons stated in paragraphs (d)(1) through (5) of this section.

Id. § 483.45(d).

63.     The requirement that each resident's entire drug/medication regimen be monitored is intended to ensure that:

- *The medication regimen helps promote or maintain the resident's highest practicable mental, physical, and psychosocial well-being*, as identified by the resident and/or representative(s) in collaboration with the attending physician and facility staff;

- *Each resident receives only those medications, in doses and for the duration clinically indicated to treat the resident's assessed condition(s)*;

- Non-pharmacological interventions (such as behavioral interventions) are considered and used when indicated, instead of, or in addition to, medication;

- Clinically significant adverse consequences are minimized; and

- *The potential contribution of the medication regimen to an unanticipated decline or newly emerging or worsening symptom is recognized and evaluated, and the regimen is modified when appropriate.*

CMS Survey and Certification Group Memorandum to State Survey Agency Directors, "State Operations Manual (SOM) Surveyor Guidance Revisions Related to Psychosocial Harm in Nursing Homes," March 25, 2016 (emphasis added).

64. These above requirements apply to all categories of medications. Id.

65. To ensure that residents are not taking any unnecessary medications and that their medications are being prescribed for legitimate medical reasons, the SNF's

21

licensed pharmacist must review, at least once a month, each resident's drug regimen. Id. § 483.45(c)(1). This drug regimen review, or "DRR," must include a review of the resident's medical chart, id. § 483.45(c)(2), and is designed to ensure that medications are being prescribed for medically valid reasons.

66.     When performing the DRR, the LTC pharmacist must identify any irregularities and report them to the attending physician and the facility's medical director and director of nursing, and these reports must be acted upon. Id. § 483.45(c)(4). Irregularities include, but are not limited to, any unnecessary drug, as defined above.  Id. § 483.45(c)(4)(i). At a minimum, the report must include the resident's name, the relevant drug, and the irregularity the pharmacist identified. Id. § 483.45(c)(4)(ii).  The attending physician must then document in the resident's medical record that the identified irregularity has been reviewed and what, if any, action has been taken to address it. Id.

67.     LTC pharmacists thus have a more clinical role than retail pharmacists and bear significant responsibility for providing medication-related expert services and prescription drug oversight. This oversight includes ensuring that individuals in the institutional setting receive the proper medications, in the proper doses, and at the proper times, and that they are not given unnecessary drugs.

## 2. Medicare Payment of SNF Pharmacy Services and Prescription Drugs

68. LTC pharmacies receive most of their payments from Medicare Parts A and D, and to a much lesser extent from state Medicaid programs, private or self-pay, and Medicare Part B.

### a. Part A

69. Medicare Part A pays SNFs a per diem prospective rate set by CMS that covers all or some portion of the first 100 days of SNF care following a qualifying hospital stay. 42 U.S. Code § 1395d(a)(2)(A); 42 C.F.R. §§ 413.335 and 409.20. In addition to skilled nursing and rehabilitative services, the bundled prospective payment made through the Part A Medicare Administrative Contractor (MAC) to the SNF includes almost all medically necessary drugs and biologicals furnished by the facility for use in the facility for the care and treatment of beneficiaries during a covered Part A stay. 42 C.F.R. § 409.25(a); see also *Medicare Claims Processing Manual*, Ch. 7, § 10.

70. Medicare Part A will also pay for a limited supply of drugs for use outside the facility if such drugs are medically necessary to facilitate the beneficiary's departure from the facility and are required until the beneficiary can obtain a continuing supply. 42 C.F.R. § 409.25(b).

71. For drugs prescribed during a resident's Medicare Part A-covered stay, the SNF bills CMS for the prescription and then must reimburse the LTC pharmacy

23

for the drugs covered under Part A, generally pursuant to negotiated fee-for-service rate.

72.     Because drugs for beneficiaries in a covered Part A SNF stay are included within Medicare's bundled per diem payments to the SNF, the SNF may not separately bill Medicare for the costs of these drugs. See 42 U.S.C. § 1395w–102(e)(2)(B) (excluding from Part D coverage drugs for which payment is available under part A or B); 42 C.F.R. § 423.100. See also *Medicare Claims Processing Manual*, Ch. 6, § 20.2; ¶ 77, *infra*.

73.     Medicare does not pay for any costs that exceed the previously determined per diem rate. SNFs thus bear the risk for the costs of all resident drug use during a Medicare Part A-covered stay.  When a SNF resident has exhausted the 100–day Part A coverage, the SNF resident's pharmacy expenses may be covered by Medicare Part D or Medicaid.

    **b.     Part D**

        *i.     Overview*

74.     The Medicare Prescription Drug Improvement and Modernization Act of 2003, ("MMA"), Pub. L. 108-173, 117 Stat. 2066, added prescription drug benefits to the Medicare program under Part D, which was implemented in January 2006, 42 U.S.C. § 1395w-101(a)(2).

75.    Part D of the Medicare program is a voluntary prescription drug benefit program that subsidizes the cost of prescription drugs and prescription drug insurance premiums for Medicare enrollees.

76.    Under Part D, Medicare pays private insurers, also known as Part D Plan Sponsors ("Part D Plan Sponsors" or "Sponsors"), for delivering prescription drug benefits to Medicare beneficiaries. This is done through contracts between CMS, which administers the Part D program, and the Sponsors that administer prescription drug plans.

77.    A Part D Plan Sponsor is a prescription drug plan, a Medicare Advantage organization that offers a Medicare Advantage prescription drug plan, a Program of All-inclusive Care for the Elderly, or a cost plan offering qualified prescription drug coverage. 42 CF.R. § 423.4.

78.    Pharmacy claims for Part D prescription drugs are not paid directly by the Government. Instead, the Government pays Part D Plan Sponsors, and the Part D Plan Sponsors reimburse pharmacies either directly or through their Pharmacy Benefit Managers ("PBM"s).

79.    In 2017, Medicare Part D covered 45 million beneficiaries.

ii.    *Part D Claims Submission and Processing*

80.     Processing payments and claims under Medicare Part D involves (1) the pharmacy claim, which the pharmacy submits to the Plan D Plan Sponsor, and (2) the Prescription Drug Event ("PDE") record, which the Sponsor submits to CMS.

81.     Before a pharmacy like Omnicare dispenses drugs to a Medicare beneficiary, it submits to the beneficiary's Part D Sponsor an electronic claim, which contains information about the patient and the patient's prescription. Once the claim is approved and the medication is dispensed, the Sponsor reimburses the pharmacy for the cost of the prescription, minus any co-pay owed by the Medicare beneficiary.

82.     For every prescription filled, the Part D Plan Sponsor prepares a PDE record and submits it to CMS. The PDE record is a summary record of individual drug claim transactions at the pharmacy that includes 37 separate mandated data fields about each prescription that was filled and the drug that was dispensed. These data fields, which are completed using information provided by the pharmacy responsible for filling the prescriptions, include information relating to the service provider of the drug, the prescriber of the drug, the quantity and number of days' supply of the drug dispensed, and whether or not the drug is covered under Medicare Part D. The PDE record enables CMS to make payment to the Sponsor and otherwise administer the Part D benefit.

83.     Sponsors are required to give CMS a PDE for all of the prescriptions dispensed to a Part D Medicare recipient, and payment is conditioned upon the

26

provision of this information. 42 U.S.C. § 1395w-115(c)(1)(C), (d)(2); 42 C.F.R. § 423.322(a).

84.     Each PDE that is submitted to CMS documents the final adjudication of a dispensing event based upon the claims submitted by the pharmacies. The PDE serves as the request for payment for each prescription submitted to Medicare under Part D. The information contained in the PDE constitute data related to the payment of claims.

*iii.     CMS Payments to Part D Plan Sponsors*

85.     CMS's prospective payments to Part D Plan Sponsors are for three subsidies and are based on estimates that Sponsors provide in their approved bids prior to the beginning of the plan year. These subsidies are: (1) the direct subsidy, which, together with beneficiary premiums, is designed to cover the sponsor's cost of providing the benefit; (2) the reinsurance subsidy, which covers the Government's share of drug costs for beneficiaries who have reached catastrophic coverage; and (3) the low-income cost-sharing subsidy, which covers the Government's portion of the cost-sharing payments for certain low-income beneficiaries. 42 C.F.R. § 423.315.

86.     The direct subsidy is paid in the form of advance monthly payments equal to the Part D plan's standardized bid, risk adjusted for health status, minus the monthly beneficiary premium. Id. § 423.315(b).

27

87.    Pursuant to 42 C.F.R. §423.505(k), entitled "Certification of data that determine payment," Sponsors must, as a condition for receiving these monthly payments, certify the accuracy, completeness, and truthfulness of all data related to the payment and must certify the accuracy, completeness, and truthfulness of all claims data submitted for payment purposes. Id. §§ 423.505(k); 423.322(a).

88.    The "Certification of data that determine payments" provision further requires that when claims data are generated by a Part D Plan Sponsor contractor or subcontractor, the contractor or subcontractor "must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement." Id. § 423.505(k)(3).

89.    PDEs submitted to Medicare for drugs that are prescribed without a legitimate medical purpose, and thus dispensed without a valid prescription, do not contain accurate, complete and truthful information about all data related to payment.

iv.    *Certification of Compliance with Applicable Federal Laws, Regulations, and CMS Instructions*

90.    Part D Plan Sponsors must comply with Federal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to applicable provisions of Federal criminal law, the False Claims Act, and the Anti-Kickback

statute, id. § 423.505(h), and they may only provide benefits for Part D drugs that are dispensed upon a valid prescription, id. § 423.104(h).

91.     Each and every contract between a Plan D Sponsor and the Government must include a provision obligating the Sponsor to comply with the applicable requirements of the Part D program and the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112.

92.     Part D Plan Sponsors must also certify in their contracts with CMS that they are in compliance with all federal laws and regulations designed to prevent fraud, waste, and abuse. 42 C.F.R. § 423.505(h)(1).

93.     Like every contract between a Sponsor and CMS, each and every contract between a Plan D Sponsor and first tier, downstream, and related entities, including pharmacies, must contain a provision requiring such entities to comply with all applicable Federal laws, regulations, and CMS instructions. Id. § 423.505(i)(3)(iv).

94.     Omnicare obtains reimbursement for drugs it provides to enrollees of a given Part D Plan in accordance with the terms of agreements negotiated between it and that Part D Plan. Omnicare has entered into such agreements with nearly all Part D Plan sponsors under which it provides drugs and associated services to their enrollees.

95.     As a subcontractor to Part D Plan Sponsors, Omnicare must therefore comply with all applicable federal laws, regulations, and CMS instructions, which include the CSA and implementing regulations defining what constitutes a valid prescription. Id. § 423.505(i)(4)(iv).

96.     As described above, Omnicare, as a subcontractor of the Part D Plan Sponsor, generates the claims data that are submitted to the Sponsor and that the Sponsor ultimately submits to CMS. Omnicare therefore "must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k)(3).

97.     Compliance with the requirement that PDE data are "true, accurate, and complete" is a condition of payment under Medicare Part D.

98.     PDEs submitted to Medicare for Schedule II drugs that are dispensed without a valid prescription do not contain accurate, complete, and truthful information about all data related to payment.

    v.    *Medicare Part D Coverage of Controlled Substances*

99.     Medicare Part D will not cover prescription drugs, including controlled substances, unless they meet the definition of a "covered Part D drug." 42 U.S.C. § 1395w-102.

100. Part D specifically excludes from the definition of a covered drug prescription drugs for beneficiaries in Part A SNF stays if the drugs were for use in the facility or to facilitate the beneficiaries' discharge. Id. § 1395w–102(e)(2)(B); 42 C.F.R. § 423.100; see also *Medicare Claims Processing Manual*, Ch. 6, § 20.2. Accordingly, when an enrollee's prescription drugs are covered by Medicare Part A, pharmacies may not bill Part D for those drugs and Part D may not pay for such drugs.

101. A "covered Part D drug" is further defined as one that "may be dispensed only upon a prescription." 42 U.S.C. § 1395w–102(e)(1)(A); 42 C.F.R. § 423.100.

102. Part D Plan Sponsors "may only provide benefits for Part D drugs that require a prescription if those drugs are dispensed upon a valid prescription." 42 C.F.R. § 423.104(h). A valid prescription is one that complies with "all applicable State law requirements constituting a valid prescription." Id. § 432.100.

103. Part D Plans may exclude from coverage any drugs that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve functioning of a malformed body part. 42 U.S.C. § 1395w-102(e)(3)(A) (providing that Part D plans "may exclude from qualified prescription drug coverage any covered part D drug … for which payment would not be made if section 1395y(a) of this title applied to this part").

31

104.   Nearly one in three Medicare beneficiaries received at least one prescription opioid through Medicare Part D. See HHS-OIG Data Brief, "Opioid Use in Medicare Part D Remains Concerning," OEI-02-18-00220 (June 2018). In 2017, 14.1 million of the total 45.2 million Part D enrollees, or 31%, received opioids through Part D. In 2016, 14.4 million Part D enrollees, or 33%, received opioids through Part D. Id.

105.   In 2017, Part D paid for 76 million opioid prescriptions, representing an average of 5.4 prescriptions per beneficiary receiving opioids, and in 2016, Part D paid for 79 million opioid prescriptions, representing an average of 5.5 per beneficiary receiving opioids. Id.

### 3.   Medicare Part A Payment of Skilled Nursing Facility Rehabilitation Therapy

106.   For beneficiaries covered under Part A of the Medicare Program, Medicare reimburses SNFs on a prospective, per diem basis for all inpatient services provided during the first 100 days of the beneficiary's stay following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.30(a)(1); 42 C.F.R. § 409.61(b), (c); 42 C.F.R. § 413.335.

107.   Payments under the SNF prospective payment system (PPS) are case-mix adjusted in order to reflect the relative resource intensity that would typically be associated with a given patient's clinical condition, as identified through the resident assessment process. Because the amount of the prospective per diem

32

payment for a particular patient is determined based on the needs of the patient and the level and amount of care provided by the facility, these prospective per diem payments are designed to compensate the SNF at higher rates for patients who require higher levels of care.

108.   Under this prospective per-diem payment system, SNFs must perform initial and periodic assessments of each resident's functional capacity and such other assessments that are necessary to account for changes in patient care needs. Id. §§ 483.20(b); 413.343(b). These assessments must be performed on the 5th, 14th, 30th, 60th, and 90th days of posthospital SNF care. Id. § 413.343(b). The date the facility performs the assessment is known as the assessment reference date.  A nursing facility may perform the assessment within a window of time before this date, or, under certain circumstances, up to five days after.

109.   The information obtained during these assessments must be recorded on a form called the Minimum Data Set ("MDS"), which the SNF must then submit directly to CMS. Id. § 483.20(f). Submission of the MDS to CMS is a condition of payment.  Id. § 413.343(a); see also 63 Fed. Reg. at 26,265.

110.   Each MDS is based on a seven-day "look back," meaning that the MDS records the patient's health and the services provided by the SNF to that patient during the seven days preceding the assessment.

111.  The MDS collects clinical information on over a dozen criteria, including hearing, speech, and vision; cognitive patterns; health conditions; and nutritional and dental status.

112.  Section O of the MDS ("Special Treatments and Procedures") collects information on how much and what kind of skilled rehabilitation therapy the facility provided to a patient during the look-back period.  In particular, Section O shows how many days and minutes of therapy a nursing facility provided to a patient in each therapy discipline (i.e., physical therapy, occupational therapy, and speech-language pathology and audiology services).  As discussed below, the information contained in Section O directly impacts the rehabilitation RUG level to which a patient will be assigned.

113.  Section N of the MDS ("Medications") collects data about a resident's medications. Effective October 1, 2017, the categories of medications include opioids. For opioids, MDS 3.0 directs providers to record the number of days an opioid medication was received by the resident at any time during the 7-day look-back period (or since admission/entry or reentry if fewer than 7 days).

114.  When completing the MDS, the provider must certify that:

the accompanying information accurately reflects resident assessment or tracking information for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used … as a basis for payment from federal funds. I

34

further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information …

Minimum Data Set (MDS) – Version 3.0 for Nursing Home Resident Assessment and Care Screening.

115.   Based upon information from the MDS, SNF residents are classified for each assessment period into a series of case-mix groups called Resource Utilization Groups ("RUGs") that represent the residents' relative direct care resource requirements and are intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs. See CMS Medicare Claims Processing Manual, Ch. 6, § 30.6.3. Under the current RUG-IV model, there are 66 RUGS.

116.   The per diem rate that Medicare pays an SNF depends, in part, on the patient's RUG classification, which is based on the MDS assessment data.  Each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs.  Residents with more specialized nursing requirements, licensed therapies, greater ADL dependency, or other conditions will be assigned to higher groups in the RUG hierarchy. Providing care to these residents is more costly, and is reimbursed on a higher level.

117. There are generally five rehabilitation RUG levels for beneficiaries who require rehabilitation therapy: Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

118. While a number of factors can influence a resident's classification under RUG-IV, most SNF residents receive therapy, and their RUG level is determined primarily by the number of therapy minutes they receive the number of therapy disciplines the patient received during the seven-day look back period.

119. In most instances, the RUG level determines Medicare payment prospectively for a defined period of time. See 63 Fed. Reg. at 26,267. For example, if a patient is assessed on day 14 of his stay, and received 720 minutes of therapy during days 7 through 14 of the stay, then the facility will be paid for the patient at the Ultra High RUG level for days 15 through 30 of the patient's stay. Payment for days 1 through 14 is based on the number of therapy minutes provided through the five-day assessment, as well as an estimate of the number of minutes to be provided through day 14. See 63 Fed. Reg. at 26,265-67; 64 Fed. Reg. at 41,662.

120. The chart below reflects the requirements for the five rehabilitation RUG levels.

| Rehabilitation | Requirements to Attain RUG |
|---|---|
| RU = Ultra high | minimum 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week |

36

| RV = Very high | minimum 500 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |
|---|---|
| RH = High | minimum 325 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |
| RM = Medium | minimum 150 minutes per week total therapy; must be provided at least 5 days per week but can be any mix of therapy disciplines |
| RL = Low | minimum 45 minutes per week total therapy; must be provided at least 3 days per week but can be any mix of therapy disciplines |

See 63 Fed. Reg. at 26,262.

121. Medicare pays the most for those beneficiaries who fall into the Ultra High RUG level, which is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. 26,252, 26,258 (May 12, 1998).

122. In addition to reflecting a patient's rehabilitation therapy needs, each RUG also reflects the patient's ability to perform certain activities of daily living ("ADL") such as eating, toileting, and bed mobility and transfers (*e.g.*, moving from a bed to a chair). A patient's ADL score (ranging from A to C) reflects his or her dependency level when performing an ADL. A very dependent patient, who cannot perform any of the ADLs without assistance, would generally receive an ADL score

37

of "C," while a patient who could perform the ADLs without assistance would receive an ADL score of "A."

123. To provide a sense of the tremendous impact that a RUG level or ADL score has on the Medicare daily rate, provided below is a summary chart reflecting the adjusted rates that Medicare paid nursing facilities for rehabilitation beneficiaries in fiscal year 2006. Medicare adjusts base rates annually and based on locality. See 42 U.S.C. § 1395yy(e)(4)(E)(ii)(IV).

| RUG Rates: Federal Rates for FY 2018 | | | | | |
|---|---|---|---|---|---|
| | Rehab with Extensive Services | | Rehab without Extensive Services | | |
| RUG Level | X | L | C | B | A |
| RU | $ 813.20 | $ 795.48 | $ 616.50 | $ 616.50 | $ 515.49 |
| RV | $ 723.81 | $ 649.38 | $ 528.88 | $ 457.99 | $ 456.22 |
| RH | $ 655.79 | $ 584.90 | $ 460.85 | $ 414.78 | $ 365.16 |
| RM | $ 601.56 | $ 551.94 | $ 404.86 | $ 380.05 | $ 312.71 |
| RL | $ 528.30 | N/A | N/A | $ 393.63 | $ 253.63 |

See 82 Fed. Reg. 46163, 46166-67 (October 4, 2017)

**4. Statements and Claims to Medicare For Payment of Skilled Nursing Facility Rehabilitation Therapy**

124. As discussed above, when completing and submitting the MDS, the provider must certify that the resident assessment information included on the MDS was collected in accordance with applicable Medicare and Medicaid requirements and is truthful and accurate and that the provider understands that this information is used as a basis for payment from federal funds. See ¶ 108, *supra*.

38

125.   Completion and submission of the MDS is a prerequisite to payment under Medicare.

126.   A patient's RUG information is incorporated into the Health Insurance Prospective Payment System (HIPPS) code. The HIPPS code consists of the three-digit RUG score and a two-digit assessment indicator. This five-digit code is used exclusively to bill Medicare for the Part A SNF Stay. See *Medicare Claims Processing Manual*, Ch. 25, § 75.5.

127.   The HIPPS code must be included on the MDS as well as the CMS-1450 claim form, which nursing facilities submit electronically to their Medicare Administrative Contractor (MAC). The MAC processes and pays the Medicare claim. See *Medicare Claims Processing Manual*, Ch. 25, § 75.5; *Medicare Claims Processing Manual,* Ch. 6, § 10.1.

128.   Medicare payment will depend largely on the HIPPS code the nursing facility submits as part of the CMS-1450.  See 63 Fed. Reg. at 26,267; *Medicare Claims Processing Manual*, Ch. 25, § 75.5.

129.   From August 2009 to August 2017, Cahaba Government Benefit Administrators was the MAC for the Life Care chain. Palmetto Government Benefit Administrators has been the MAC for the Life Care chain since September 2017.

130.   CMS-1450 requires providers to certify that the information is "true, accurate, and complete" and "[t]hat the submitter did not knowingly or recklessly

39

disregard or misrepresent or conceal material facts." The claim form further notes that "THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)." Form CMS-1450 (emphasis in original).

131. SNFs that provide services to Medicare beneficiaries must also file an annual Medicare cost report with its MAC. 42 U.S.C. § 1395g; 42 C.F.R. § 413.20(b). The cost report is a collection of information for the reporting period that contains provider information such as facility characteristics, utilization data, cost and charges by cost center (in total and for Medicare), Medicare settlement data, and financial statement data. CMS maintains the cost report data in the Healthcare Provider Cost Reporting Information System (HCRIS).

132. Cost reports are used to determine the SNF's annual Medicare reimbursable cost. Specifically, the reports enable Medicare to determine whether the SNF is entitled to more reimbursement than it already received through prospective interim payments, or whether the SNF has been overpaid and must reimburse Medicare.

133. The cost report is also used as a part of the calculation of the prospective payment rates for a health care facility in the next fiscal year. 42 C.F.R. §413.337(a).

134. Cost reports contain the following certification provision: "I further certify that I am familiar with the laws and regulations regarding the provision of health care services, *and that the services identified in this cost report were provided in compliance with such laws and regulation*." Form CMS-2540-10 (emphasis added).

135. This certification conditions Medicare payment upon compliance with the specific laws and regulations applicable to skilled nursing facilities, including state controlled substances laws, the federal Controlled Substances Act, and conditions of participation governing quality of care, pharmacy services, and rehabilitative services. See 42 U.S.C. §§ 1395i-3(b), (c), and (d), and 42 C.F.R. §§ 483.10-483.65.

136. Compliance with these laws and regulations is material to the Government's payment of claims for SNF services.

## 5. Medicare Part B Payment of Skilled Nursing Facility Rehabilitation Therapy

137. Medicare Part B is a voluntary supplemental insurance program that provides medical insurance benefits for aged and disabled individuals who enroll in the program. 42 U.S.C. § 1395j. The benefits provided under Part B to covered SNF residents include payment for certain reasonable and necessary medical and other

41

health services, including outpatient physical therapy services, outpatient occupational therapy services, and outpatient speech-language pathology services, once the beneficiary has exhausted coverage for those services under Part A. 42 U.S.C. § 1395k(a)(2); see also 42 C.F.R. §§ 410.59, 410.60, 410.62.

138. For inpatient Part B residents not in a covered Part A stay and nonresidents who receive outpatient rehabilitation services, payment for such services is under the Medicare Physician Fee Schedule (MPFS). See 42 U.S.C. § 1395yy(e)(9); *Medicare Claims Processing Manual*, Ch. 5, § 10; *Medicare Claims Processing Manual*, Ch. 7, § 10.2. Thus, if the beneficiary has Part B, but not Part A coverage (e.g., Part A benefits are exhausted), the SNF must bill for any rehabilitation services. Id.

139. Medicare will typically pay for 80% of the cost of these therapy services, with the beneficiary responsible for the remaining 20%. See 42 U.S.C. §§ 1395l(a)(8), 1395m(k).

140. Under Part B, Medicare pays on a per-unit basis, with each "unit" of therapy equal to 15 minutes of therapy provided. When only one service is provided in a day, providers may not bill for services performed for less than 8 minutes. For any single timed CPT code in the same day measured in 15-minute units, providers must bill a single 15-minute unit for treatment greater than or equal to 8 minutes through and including 22 minutes. If the duration of a single modality or procedure

42

in a day is greater than or equal to 23 minutes, through and including 37 minutes, then 2 units should be billed.

141. Part B SNF claims are also submitted on CMS-1450 using Healthcare Common Procedure Coding System (HCPCS) coding to indicate the number of units for outpatient rehabilitation services. 42 C.F.R. § 424.32(a)(5). See also *Medicare Claims Processing Manual*, Ch. 7, § 20.

142. When submitting a claim for services to Medicare Part B, the submitter must certify that the information contained on the claim form is "true, accurate, and complete" and "[t]hat the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." See ¶ 66, *supra*.

**6.** **Coverage of Skilled Nursing Facility Rehabilitation Therapy Under Medicare Parts A and B**

143. Among the conditions that Medicare imposes on its Part A skilled nursing facility ("SNF") benefit are that: (1) the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

43

144. Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the nursing facility and to re-certify to the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter. See 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

145. To be considered a skilled service, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists. See 42 C.F.R. § 409.31(a).

146. Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitious exercises (e.g., exercises to improve gait, maintain strength or endurance, or assistive walking). See 42 C.F.R. § 409.33(d). "Many skilled nursing facility inpatients do not require skilled physical therapy services but do require services, which are routine in nature. Those services can be performed by supportive personnel; e.g. aides or nursing personnel." *Medicare Benefit Policy Manual*, Chapter 8, § 30.4.1.1.

147. Medicare Parts A and B will only cover those services that are reasonable and necessary. See 42 U.S.C. § 1395y(a)(1)(A); see also 42 U.S.C. §

44

1320c-5(a)(1) (providers must assure that they provide services economically and only when, and to the extent, medically necessary), 42 U.S.C. § 1320c-5(a)(2) (services provided must be of a quality which meets professionally recognized standards of health care).

148. In the context of skilled rehabilitation therapy, this means that the services furnished must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; must be consistent with accepted standards of medical practice; and must be reasonable in terms of duration and quantity. See *Medicare Benefit Policy Manual*, Ch. 8, § 30.

149. In order to assess the reasonableness and necessity of those services and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l(e).

150. As set forth below, Defendant Life Care routinely and knowingly ordered unnecessary therapies for Life Care residents and required its physical, occupation, and speech-language therapists to perform such unnecessary, and

45

oftentimes dangerous and harmful, therapies on Life Care patients for the sole purpose of (a) increasing total minutes of therapy, thereby increasing the per diem rates paid by Medicare for services provided to Part A beneficiaries, and (b) increasing total units of therapy, thereby increasing reimbursements from Medicare for services provided to Part B beneficiaries.

### D. The TRICARE Program

151. TRICARE (formerly CHAMPUS) is a federally funded medical benefit program established by statute. 10 U.S.C. §§ 1071-1110. TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.

152. TRICARE has adopted a skilled nursing facility benefit similar to Medicare's, except that it excludes Medicare's 100-day limit on SNF services. 10 U.S.C. § 1074j(a) and (b); 32 C.F.R. § 199.4(b)(3)(xiv). Specifically, TRICARE has adopted Medicare's SNF PPS payment methods and reimbursement rates, consolidated billing requirements, and Minimum Data Set (MDS) assessment requirements effective with all SNF admissions occurring on or after August 1, 2003.

153. SNF services provided to beneficiaries who satisfy the qualifying coverage requirements of the TRICARE SNF benefit are thus covered under the SNF PPS. See 32 C.F.R. § 199.14(b)(1); *TRICARE Reimbursement Manual 6010.61-M*, Chp. 8, § 4.1.

46

1. **TRICARE Payment and Coverage of SNF Pharmacy Services and Prescription Drugs**

154. The PPS per diem payment rate for TRICARE-covered SNF services covers all costs (routine, ancillary, and capital-related) of furnishing those services and is comprised of the therapy component, the non-case-mix component, and nursing component. 32 C.F.R. § 199.14(b)(2) ("The SNF payment rates represent payment in full … for all costs (routine, ancillary, and capital-related) associated with furnishing inpatient SNF services to TRICARE beneficiaries ..."). See also *TRICARE Reimbursement Manual 6010.61-M*, Chp. 8, §§ 4.2.14.1, 4.2.14.2. The nursing component includes non-therapy ancillary costs such as medications. Id. § 4.2.14.2.

155. TRICARE does not cover drugs that are not medically or psychologically necessary for the diagnosis or treatment of a covered illness. 32 C.F.R. § 199.4(a)(1)(i). TRICARE-covered skilled nursing services thus include only medically necessary prescription drugs provided by the facility. 32 C.F.R. § 199.4(b)(3)(xiv)(E); *TRICARE Reimbursement Manual 6010.61-M*, Chp. 8, § 4.2.14.1.

2. **TRICARE Payment and Coverage of SNF Rehabilitation Therapy Services**

156. TRICARE covers the same skilled nursing services as Medicare. The regulatory authority implementing the TRICARE program provides reimbursement

47

to health care providers applying the same reimbursement scheme and coding parameters that the Medicare program applies. 10 U.S.C. §§1079(j)(2) (institutional providers).

157. TRICARE, like Medicare, pays only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).

158. TRICARE follows Medicare's PPS and RUGs methodology and assessment schedule, and beneficiaries are assessed using the same MDS form used by Medicare. See *TRICARE Reimbursement Manual* 6010.58M, Ch. 8, § 2, 4.3.5 – 4.3.7, 4.4.3.

159. Under the TRICARE for Life program, there are beneficiaries who are enrolled in Medicare and are still eligible for TRICARE ("dual eligible beneficiaries"). For these dual eligible beneficiaries, TRICARE is the secondary payor to Medicare and is responsible to the skilled nursing facility for any amounts not covered by Medicare. Id. at 4.4.

160. TRICARE prohibits practices such as submitting claims for services which are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5). TRICARE considers "[b]illings or CHAMPUS claims which involve flagrant and persistent overutilization of services

48

without proper regard for results, the patient's ailments, condition, medical needs, or the physician's orders" to be fraud. 32 C.F.R. § 199.9(c)(3). Such practices are deemed abusive and cause financial loss to the United States. 32 C.F.R. § 199.9(b).

161. For TRICARE dual eligible beneficiaries, TRICARE follows Medicare's determination regarding medical necessity. If services are determined not to be medically necessary under Medicare, they are not covered under TRICARE. *TRICARE Reimbursement Manual* 6010.58M, Ch. 8, § 2, 4.3.16 (Note).

## V.    <u>FACTUAL ALLEGATIONS</u>

### A.    **Defendants Life Care and Omnicare Improperly Over-Prescribed, Over-Dispensed, and Over-Billed for Schedule II Controlled Substances**

### 1.    <u>The Relationship Between Omnicare and Life Care</u>

162. As noted, Defendant Omnicare is the nation's largest long-term care pharmacy. LTC pharmacies like Omnicare provide skilled nursing facilities and other long-term care institutions with prescription and non-prescription medications and with services related to medication delivery, including the review of drug orders, coordination of documentation related to prescriptions, in-service training for nursing home staff, and drug regimen reviews.

163. The provision of a LTC pharmacy's services is generally pursuant to a preferred provider agreement with the SNF chain that designates the LTC pharmacy as the pharmacy of choice for facilities in that chain. These preferred provider

49

agreements set forth the contract pricing for pharmacy products and services, establish payment terms and billing processes, and provide mechanisms for resolving billing disputes. The LTC pharmacy will then enter into separate agreements with each individual facility in the chain. On information and belief, Omnicare operated under such agreements with Life Care.

164. Omnicare has been providing skilled nursing pharmacy services to Life Care facilities since at least 2005. Omnicare and Life Care operate in concert through arrangements under which Omnicare serves as the pharmacy for facilities in the Life Care chain, including LCCH.

165. Omnicare is a participating pharmacy provider in federally funded health care programs including Medicare.

166. Many of the Life Care SNF residents for whom Omnicare provides pharmaceuticals and pharmacy services are enrolled in Medicare Part A and/or Medicare Part D. Depending on which program provides coverage, when drugs are prescribed, the Government reimburses the SNF and/or Omnicare for services provided to Life Care's covered patients.

167. For beneficiaries covered under a Medicare Part A stay, Life Care facilities are paid a per diem rate for all drugs and services provided to the beneficiary during the covered stay. Life Care then reimburses Omnicare out of the per diem payment it receives from CMS. Because it receives these Part A payments,

50

Life Care facilities must file annual cost reports that reflect their operational expenses, including the costs of pharmacy products and services obtained from LTC pharmacies for Part A patients.

168. Once a Life Care resident's Part A coverage has been exhausted, his or her prescription and other pharmacy expenses are generally covered by Medicare Part D. For residents covered by Part D, a LTC pharmacy such as Omnicare bills the resident's private plan sponsor directly for pharmaceutical products and services provided to the resident.

169. As a material condition of its contractual agreement with each health care program, including Medicare, and as a material condition of each claim it submits for reimbursement to any such program, a LTC pharmacy such as Omnicare agrees not to submit or cause the submission of false or fraudulent claims for reimbursement. Omnicare would have reason to know that each Medicare-participating long-term care facility, as a material condition of its contractual agreements with federally funded programs, also agrees not to submit or cause the submission of any false or fraudulent claim for reimbursement. Omnicare thus knows, or has reason to know, that Medicare would not pay a claim if it knew the claim was in violation of state or federal laws or regulations.

## 2.     **The National Opioid Epidemic**

170.   The prescribing and dispensing of controlled substances, including prescription opioid analgesics, without a legitimate medical purpose and outside the usual course of professional practice, has largely contributed to, if not caused, this crisis.

171.   Older adults are particularly susceptible to the adverse effects of pain medication, including falls, fractures, and delirium. See Naples, J. G., Gellad, W. F., & Hanlon, J. T, The Role of Opioid Analgesics in Geriatric Pain Management, *Clinics in geriatric medicine*, 32(4), 725-735 (2016). Opioids in the nursing home setting can also lead to a decreased ability to perform activities of daily living and an overall decline in the resident's quality of life. See HHS-OIG Data Brief, "Opioid Use in Medicare Part D Remains Concerning," OEI-02-18-00220 (June 2018).

172.   Despite the significant and well-documented negative impacts of opioids on aging populations, the Office of Inspector General (OIG) estimates that one in three Medicare Part D participants received a prescription for opioids in 2017, and that approximately one in ten Part D beneficiaries received opioids on a regular basis in 2017, with 4.9 million beneficiaries receiving opioids for a total of three or more months. Id.

173.   OIG has noted that "these high numbers raise questions as to whether opioids are being appropriately prescribed and used," and that, given the risk of

52

opioid dependence, "it is essential that Medicare beneficiaries receive the lowest effective amount of opioids." Id.

174. Prescribers and dispensers play a crucial role in ensuring that beneficiaries receive appropriate amounts of opioids. Defendants nonetheless have repeatedly over-prescribed and over-dispensed opioids to Life Care residents. These highly addictive narcotic opioids were prescribed for excessive durations, without adequate indications for their use, without a legitimate medical purpose, and often in the presence of adverse consequences.

### 3. Life Care Physicians Routinely Prescribed Medically Unnecessary Schedule II Controlled Substances

175. Long-term opioid use often begins with the treatment of acute pain. For this reason, CDC cautions that the lowest effective dose and duration should be prescribed for acute pain. Additionally, prescribers should not prescribe a quantity greater than needed for the expected duration of pain severe enough to require opioids. According to the CDC, three or fewer days will usually be sufficient; more than seven days of opioids is rarely needed to address acute pain. Id.

176. Notwithstanding these recommendations, Life Care residents are routinely prescribed opioids on a long-term basis for acute post-surgical pain.

### a. Life Care's Pattern and Practice of Overprescribing Opioids

177. Most patients who are discharged to Life Care facilities for rehabilitation therapy following surgical procedures are admitted with short-term prescriptions (e.g., three to ten days) for narcotic pain medications.

178. Although patients admitted with acute pain risk developing addictions, Life Care physicians routinely keep such patients on opioids for extended periods, often increasing dosages, duration, and frequency. At all times relevant to this Complaint, these physicians were acting within the scope of their duties as agents, servants, and/or employees of, and in furtherance of the business interests of, Life Care.

179. For example, it was not uncommon for Life Care physicians to write successive 30-day prescriptions for patients whose hospital discharge orders provided that the medications were for up to ten or fewer days. It was also not uncommon for Life Care physicians to increase the dosages of these opioids.

180. Life Care's prescribing of medically unnecessary and excessive narcotic opioids—in concert with Omnicare's over-dispensing of opioids – has led to patients becoming more debilitated, thus requiring more rehabilitation services. Even more disturbingly, Life Care's and Omnicare's practices increase the risk of addiction. Patients who are opioid naïve or who have no history of opioid abuse or misuse leave Life Care facilities addicted to prescription opioids.

54

181.  Life Care's practice of prescribing excessive narcotic opioids is in violation of the CSA's requirement that controlled substances prescriptions be issued only for legitimate medical purposes.  Its practice also violates federal health care program regulations requiring that residents be free from unnecessary drugs and receive only those medications – in an appropriate dose and for an appropriate duration – that are clinically indicated to meet his or her assessed needs. See CMS Survey and Certification Group Memorandum to State Survey Agency Directors, "State Operations Manual (SOM) Surveyor Guidance Revisions Related to Psychosocial Harm in Nursing Homes," March 25, 2016.

**b.  Specific Examples of Patients for whom Medically Unnecessary Opioids were Prescribed**

*Patient A*

182.  Patient A is a 74-year-old Medicare patient who was admitted to LCCH for skilled nursing care on December 31, 2018 with a diagnosis of deep vein thrombosis.  Her December 28, 2018 hospital discharge orders included a prescription for oxycodone 10/325 mg, one tablet every four hours as needed for pain, for up to ten days.

183.  On January 4, 2019, Life Care Physician A (who also worked at other Life Care facilities) prescribed an additional 180 tablets of oxycodone 10/325 mg, one tablet every four hours as needed for pain (30-day supply). At all times relevant to this Complaint, Physician A was acting within the scope of her duties as an agent,

55

servant, and/or employee of Life Care, and in furtherance of the business interests of Life Care.

184.    On January 28, 2019, Physician A prescribed another 180 tablets of Percocet 10/325 mg, one tablet every four hours as needed for pain (30-day supply).

185.    On February 25, 2019, Life Care Physician B (who also worked at other Life Care facilities) prescribed an additional 200 tablets of Percocet 10 mg, one tablet every four hours as needed for pain (50-day supply). At all times relevant to this Complaint, Physician B was acting within the scope of his duties as an agent, servant, and/or employee of Life Care, and in furtherance of the business interests of Life Care.

186.    These prescriptions were filled and dispensed by Omnicare, acting in concert with Life Care through the arrangement described above.

187.    Patient A began to show signs of addiction, including setting an alarm on her phone and asking for pain medication before the next dose was indicated. Patient A would transfer herself to a wheelchair and self-propel to the nurses' station to ask for pain medication.

*Patient B*

188.    Patient B is a 79-year-old Medicare patient with a documented history of chronic prescription opioid use who was admitted to LCCH on December 26, 2018 following a left ankle fracture.  Patient B's hospital discharge orders included

56

a prescription for 40 tablets of hydrocodone 5/325 mg, one tablet every eight hours as needed for pain, for up to ten days.

189. On December 28, 2018, Life Care Physician A prescribed an additional 180 tablets of hydrocodone 5/325 mg, and increased the frequency of Patient B's doses, instructing Patient B to take one tablet every four hours as needed for pain (30-day supply).

190. On February 5, 2019, Physician A prescribed another 180 tablets of hydrocodone 5/325 mg, one tablet every four hours (30-day supply). Upon discharge from LCCH on February 24, 2019, Patient B was given 40 tablets of hydrocodone 5/325 mg.

191. Omnicare filled and dispensed all prescriptions for Patient B, acting in concert with Life Care through the arrangement described above.

192. Patient B began to exhibit signs and symptoms of addiction, including setting an alarm to ask for the next dose.

*Patient C*

193. Patient C is a 67-year-old Medicare patient who was admitted to LCCH for skilled nursing care on November 21, 2018 following a left heel fracture. Patient C's hospital discharge orders included a prescription for a three-day supply, or 18 tablets, of oxycodone 10 mg, one tablet every four hours as needed for pain.

57

194. On November 26, 2018, Omnicare advised Life Care Physician A that a follow-up prescription for 42 tablets of oxycodone 10 mg was needed. The notice indicated that, per Physician A's verbal authorization, this medication had already been dispensed on an emergency basis. Physician A signed the November 26, 2018 authorization for emergency dispensing of oxycodone on December 3, 2018.

195. On November 27, 2018, Physician A prescribed an additional 180 tablets of oxycodone 10 mg, one tablet every four hours as needed (30-day supply).

196. On December 31, 2018, Physician A prescribed another 200 tablets of oxycodone 10 mg, one tablet every six hours as needed for pain (50-day supply).

197. One week later, on January 7, 2019, Physician A prescribed an additional 180 tablets of oxycodone 10 mg, one tablet every four hours as needed for pain (30-day supply).

198. Omnicare filled and dispensed all prescriptions for Patient C, acting in concert with Life Care through the arrangement described above.

199. Patient C began to demonstrate signs and symptoms of addiction. Despite signs of addiction, Physician A continued to prescribe high dosages of oxycodone for Patient C.

*Patient D*

200. Patient D is a 53-year-old disabled Medicare patient who was admitted to LCCH on November 22, 2018 with cellulitis of the left lower leg. His hospital

58

discharge orders included a prescription for a five to 15-day supply, or 60 tablets, of oxycodone 5 mg, with instructions to take one to two tablets every four to six hours as needed.

201.   On November 23, 2018, Physician B prescribed an additional 120 tablets of Percocet 5 mg, one to two tablets every four hours as needed (10- to 20-day supply).

202.   On November 27, 2018, Physician B prescribed another 240 tablets of oxycodone 15 mg, representing a 10 mg increase in strength, one tablet every four hours as needed (40-day supply).

203.   Omnicare filled and dispensed all prescriptions for Patient D, acting in concert with Life Care through the arrangement described above.

*Patient E*

204.   Patient E is a 92-year-old Medicare patient who was admitted to LCCH on December 22, 2018 following right hip open reduction internal fixation surgery. Patient E's hospital discharge orders included a prescription for a five to ten-day supply, or 60 tablets, of oxycodone 5 mg, with instructions to take one to two tablets every four hours as needed for pain.

205.   On January 7, 2019, Physician A ordered an additional 30 to 60-day supply, or 360 tablets, of oxycodone 5 mg. The prescription instructed Patient E to take one tablet in the morning, scheduled, and continued the order for one tablet

every four hours as needed for moderate pain, and two tablets every four hours for severe pain.

206. Omnicare filled and dispensed all prescriptions for Patient E, acting in concert with Life Care through the arrangement described above.

*Patient F*

207. Patient F is a 66-year-old Medicare patient who was admitted to LCCH on January 25, 2019 following open reduction internal fixation surgery of the right hip. According to Patient F's hospital records, Patient F had documented chronic pain syndrome, worsening neck and back pain, and had had multiple previous neck and back surgeries. Patient F had been treated through the hospital's Pain Management Service, had been weaned off her narcotics, and had been using increasing doses of NSAIDs and Tylenol to treat her pain.

208. On January 20, 2019, Patient F's hospital physician prescribed a five to ten-day supply, or 60 tablets, of oxycodone 5 mg, with instructions for Patient F to take one or two tablets every four hours as needed for pain.

209. On January 28, 2019, Physician A prescribed an additional 360 tablets of oxycodone 5 mg, one to two tablets every four hours as needed, representing a 30- to 60-day supply.

210. Patient F began to show signs of addiction, including requesting every four to six hours the maximum number of tablets.

60

211.   Omnicare filled and dispensed all prescriptions for Patient F, acting in concert with Life Care through the arrangement described above.

212.   The nursing notes of several different nurses documented that Patient F began to exhibit signs of opioid addiction, including setting her cell phone alarm to wake her every four hours so she can request the next oxycodone dose.

*Patient G*

213.   Patient G is a 94-year-old Medicare patient who was admitted on December 20, 2018 following multiple fractures of his ribs. Patient G's hospital physician had prescribed ten tablets of hydrocodone 5/325 mg, with instructions for Patient G to take one tablet every six hours as needed for severe pain for up to 10 days. The prescription included further instruction to **"[d]ecrease dosage to ½ tablet every six hours as tolerated then wean to discontinue**." (Emphasis supplied).

214.   Despite the hospital physician's explicit instruction to discontinue this medication, on December 21, 2018, Physician A prescribed an additional 30 to 60-day supply, or 120 tablets, of Norco 5/325 mg, with instructions for Patient G to take one tablet every six hours as needed for severe pain and ½ tablet every six hours as needed for moderate pain.

215.   Omnicare filled and dispensed all prescriptions for Patient G, acting in concert with Life Care through the arrangement described above .

61

*Patient H*

216.   Patient H is an 84-year-old Medicare patient who was admitted to LCCH on February 20, 2019 with metabolic encephalopathy and dementia. Upon discharge from the hospital, Patient H had been prescribed a three-day supply, or 12 tablets, of Percocet 5/325 mg, with instructions to take one tablet every six hours as needed for pain.

217.   Due to his dementia, it was not uncommon for Patient H, when he first arrived at LCCH, to become agitated and yell out for help, often simply because he had a question or wanted someone to visit with him. During his first two weeks at LCCH, Patient H typically asked for just one or two tablets in a 24-hour period for pain.

218.   On March 6, 2019, Physician A ordered 200 tablets of oxycodone 5 mg, to be taken every six hours scheduled (50-day supply). On March 12, 2019, Physician A wrote a prescription for an additional 30-day supply, or 120 tablets, of Percocet 5/325 mg, to be taken every six hours as needed for pain.  These drugs were not prescribed and administered for medically accepted indications, but apparently were prescribed and administered as a way to make Patient H easier to manage. Since receiving the narcotics routinely every six hours, Patient H has been calmer and has caused fewer disturbances.

219. Omnicare filled and dispensed all prescriptions for Patient H, acting in concert with Life Care through the arrangement described above.

*Additional Patient Examples*

220. The following are examples of several other instances in which Life Care physicians prescribed, and Omnicare filled and dispensed, additional 30- to 60-day supplies of narcotic opioids for patients whose hospital physicians had prescribed much more limited supplies of the same drugs. These prescriptions were issued, filled, and dispensed even though the patients' medical records contained insufficient or no documentation demonstrating that continued opioid therapy was medically necessary or clinically indicated.

- *Patient I*: Patient I is a 66-year-old Medicare patient who was admitted to LCCH on February 22, 2019 following a peg tube insertion. Upon discharge from the hospital, Patient I's hospital physician had prescribed 10 tablets of Norco 5/325 mg, with instructions to take one tablet every four hours as needed. On February 26, 2019, Life Care Physician A prescribed an additional 30-day supply, or **180 tablets**, of Norco 5/325 mg.

- *Patient J*: Patient J is a 72-year-old Medicare patient who was admitted to LCCH on March 8, 2019 following a right ankle fracture. Upon discharge from the hospital on March 8, 2019, Patient J's hospital physician prescribed a three-day supply, or 12 tablets, of hydrocodone 10/325 mg, with instructions to take one tablet every six hours as needed. On March 11, 2019, Life Care Physician A prescribed an additional 30-day supply, or **120 tablets**, of Norco 10/325 mg, one tablet every six hours as needed.

- *Patient K*: Patient K is a 59-year-old Medicare patient who was admitted to LCCH on January 18, 2019 following an appendectomy. Patient K had been discharged from the hospital with a prescription for oxycodone 10/325 mg, with instructions to take one tablet every six hours as needed. On January 22, 2019, Life Care Physician A prescribed an additional 30-

63

day supply, or **180 tablets**, of Percocet 10/325 mg, with instructions to increase the frequency to one tablet every four hours as needed.

- *Patient L*: Patient L is an 86-year-old Medicare patient who was re-admitted to LCCH on February 21, 2019 following a procedure to insert a nephrostomy tube. The hospital physician had prescribed 10 tablets of hydrocodone 5/325 mg, with instructions for Patient L to take one tablet every four hours as needed for pain. On February 27, 2019, Life Care Physician B ordered an additional 40-day supply, or **240 tablets**, of hydrocodone 5/325 mg, with instructions to take one tablet every four hours as needed for pain.

- *Patient M*: Patient M is an 87-year-old Medicare patient with dementia who was admitted to LCCH on March 12, 2019 following a right shoulder fracture. Patient M's hospital physician had prescribed 18 tablets of Norco 5/325 mg, with instructions to take one tablet every four hours as needed for pain. On March 15, 2019, Life Care Physician A prescribed an additional 30-day supply, or **180 tablets**, of Norco 5/325 mg, with instructions for Patient M to take one tablet every four hours as needed.

- *Patient N*: Patient N is a 93-year-old Medicare patient, admitted to LCCH on September 25, 2018 following a left tibia fracture. Patient N's hospital discharge orders included a prescription for oxycodone 5/325 mg, one tablet every four hours as needed, for up to 10 days. On October 5, 2018, Physician A discontinued this dose and wrote new prescription for an additional 360 tablets of Percocet 5/325 mg, one tablet every four hours as needed (60-day supply). Patient N began to show signs of dependency, including requesting the next dose before it was indicated.

- *Patient O*: Patient O is a 75-year-old Medicare patient, admitted January 15, 2019 with deep vein thrombosis, blood in his urine, urostomy, and a stage 1 sacral wound. Patient O's hospital discharge orders included a prescription for 15 tablets of Percocet 5/325mg, one every four hours as needed (2½-day supply). On January 24, 2019, Life Care Physician A prescribed an additional 180 tablets of Percocet 5/325 mg, one every four hours as needed (30-day supply).

- *Patient P*: Patient P is a 91-year-old Medicare patient admitted to LCCH on February 20, 2019 following hospitalization for a pelvic injury. Patient

64

P's hospital physician had prescribed 24 tablets of hydrocodone 5/325 mg, one every four hours as needed (four-day supply). On February 27, 2019, Life Care Physician A prescribed another 180 tablets of oxycodone 5/325 mg, one every four hours as needed (30-day supply).

- *Patient Q*: Patient Q is a 69-year-old Medicare patient admitted to LCCH on February 20, 2019 following a stroke. Patient Q had been discharged from the hospital with a prescription for 18 tablets of Roxicodone 5 mg, one every four hours as needed (three-day supply). On February 27, 2019, Life Care Physician A prescribed an additional 180 tablets of oxycodone 5 mg, one every four hours as needed (30-day supply).

- *Patient R*: Patient R is an 80-year-old Medicare patient admitted to LCCH on February 12, 2019 with acute respiratory failure with hypoxia. Patient R's hospital physician prescribed 15 tablets of hydrocodone 5/325 mg, one every four hours as needed (2½-day supply). On February 18, 2019, Life Care Physician A prescribed an additional 180 tablets of Norco 5/325 mg, one every four hours as needed (30-day supply).

- *Patient S*: Patient S is a 30-year-old disabled and mentally-delayed Medicare patient who was admitted to LCCH on February 5, 2019 post-seizures. Patient S's hospital discharge orders included a prescription for 6 tablets of hydrocodone 10/325 mg, one every six hours as needed. On February 7, 2019, Life Care Physician A prescribed an additional 90 tablets of Norco 10/325 mg, one every eight hours as needed (30-day supply).

- *Patient T*: Patient T is a 72-year-old Medicare patient admitted to LCCH March 13, 2019 following a left hip fracture. Patient T's hospital physician prescribed 10 tablets of Percocet 5/325 mg, one to two every four hours as needed. On March 14, 2019, Life Care Physician A prescribed an additional 360 tablets of Percocet 5/325mg, one or two every four hours as needed (30- to 60-day supply).

221.   The opioids prescribed to Patients A-T were prescribed despite initial hospital physician prescriptions directing that the opioids be taken only for a short amount of time; despite the lack of supporting diagnoses or documentation in the

65

patients' medical records justifying such heavy and frequent dosages; and oftentimes despite clear signs of physical or psychological dependence.

222. With knowledge that these drugs were not medically necessary to treat the patients' conditions and that these prescriptions were not issued for a legitimate medical purpose and in the usual course of professional practice, Life Care submitted claims for payment to Medicare for these drugs and/or cost reports in which it falsely certified that it was in compliance with various federal and state rules and regulations, including Medicare CoPs promulgated at 42 C.F.R. § 483.1 *et seq*., and the CSA and its implementing regulations. Omnicare, acting in concert with Life Care, caused the submission of these false certifications and false claims. Life Care's and Omnicare's violations of these fundamental requirements, had they been disclosed, would have been material to CMS's decision to pay.

223. With respect to any prescriptions covered under Part D, Life Care acted in concert with Omnicare with knowledge that these prescriptions were not issued for a legitimate medical purpose and in the usual course of professional practice. Life Care submitted the prescriptions to Omnicare, knowing that Omnicare would submit the resulting claims to Medicare Part D for payment, and thus caused the submission of false and fraudulent claims and false statements to get claims paid.

### 4. **Omnicare Pharmacists Routinely Dispensed Medically Unnecessary Schedule II Controlled Substances That Were Issued Without a Legitimate Medical Purpose**

224. At all times relevant hereto, Omnicare filled and dispensed the prescriptions that were issued to Life Care residents, including Patients A-T described above, while acting in concert with Life Care through the arrangement described above.

225. Pharmacies, both institutional and retail, play an essential role in overseeing prescriptions for controlled substances, and narcotic opioid analgesics in particular. In recognition of this role, both federal and state laws require pharmacists to assess the suitability of all prescriptions for controlled substances before dispensing those drugs.

226. In the SNF setting, LTC pharmacies are critical to the care continuum, managing medications for vulnerable and medically fragile and complex residents. Because SNF patients typically receive eight to ten different medications each day, effective delivery of pharmacy services is essential to the overall care and services those patients receive. Through their consultant pharmacists, LTC pharmacies manage medications and related pharmacy services, and review residents' clinical needs to ensure that patients receive the right medications at the right time. These services begin upon receipt of each prescription and continue after dispensing the drug.

227.  As the dispensing and consulting pharmacy for Life Care residents, Omnicare was required to provide oversight and review of residents' medications to ensure that the drugs ordered for each resident were appropriate, i.e., that the prescriptions were not for excessive doses, for excessive durations, or without adequate indications for their use. 42 C.F.R. § 483.45(c), (d).

228.  In breach of these requirements, Omnicare's pharmacists filled the prescriptions for the excessive narcotic opioids dispensed to Patients A-T, notwithstanding that such excessive opioids were medically appropriate.

229.  To the extent Part D claims were submitted, Omnicare knowingly made, or caused to be made, false or fraudulent PDEs that inaccurately designated these drugs as medically necessary covered Part D drugs and that inaccurately represented that the drugs were dispensed for a legitimate medical purpose; and thus Omnicare knowingly caused Part D Plan Sponsors to submit false claims to Medicare for medically unnecessary Schedule II drugs that had been dispensed without a legitimate medical purpose, and knowingly caused Part D Plan Sponsors to submit false certifications to Medicare that were material to the payment of claims.

230.  Omnicare's actions described above also caused the submissions by Life Care of false claims to Part A. To the extent Part D claims were submitted, Omnicare itself submitted claims to Part D, and Life Care caused the submission of

those claims, for the prescriptions issued and opioids dispensed to Patients A-T and other patients, with actual knowledge, or in reckless disregard, of the fact that they were not issued for a legitimate medical purpose and thus were not reimbursable. Omnicare and Life Care acted in concert with each other in doing so through the arrangement described above.

### 5. The Unlawfulness of a Prescription is Material to a Federal Health Care Program's Decision to Pay

231.   Compliance with federal and state rules prohibiting the prescribing and dispensing of controlled substances without a legitimate medical purpose and beyond the scope of professional practice is a condition of these medications being covered by Medicare or another federal health care program. Moreover, compliance with these requirements is and was at all times relevant to this Complaint material to the federal health care program's decision to pay claims for controlled substances.

232.   The Government has noted that it "routinely denies payment for controlled substance medications, or seeks to recoup payments already made, when such prescriptions are not issued or dispensed for a legitimate medical purpose in the usual course of professional practice." *United States v. Oakley Pharmacy, Inc, et al.*, Case No. 2:19-cv-00009, Doc. 1 (M.D. Tenn. Feb. 7, 2019).

233.   Defendants knew or reasonably should have known that Federal and State Health Care Programs would not pay claims for controlled substances had they

known that the controlled substance prescriptions at issue lacked a legitimate medical purpose for a medically accepted indication.

**B. Defendant Life Care Provided and Billed Federal Healthcare Programs for Medically Unnecessary and Excessive Therapy Services**

234. Medicare and other federal healthcare programs, including TRICARE, only pay for rehabilitative therapy services that are reasonable and necessary, consistent with the nature and severity of the patient's illness or injury, the patient's particular medical needs, and accepted standards of medical practices.

235. Services are reasonable and necessary if they are safe and effective, of appropriate duration and frequency within accepted standards of medical practice for the particular diagnosis or treatment, and meet the patient's medical needs. *CMS Medicare Program Integrity Manual*, Chp. 3, § 3.6.2.2.

236. At all times relevant hereto, Life Care knew that medically unnecessary rehabilitation therapy, including physical therapy ("PT"), occupational therapy ("OT"), and speech language pathology therapy ("speech therapy" or "ST"), was not reimbursable by Medicare and TRICARE. The sources of Life Care's knowledge of the impropriety of medically unnecessary therapy includes its settlement of multi-year litigation by the United States in an action filed by Relator's counsel in the Eastern District of Tennessee in 2008. Life Care nevertheless has continued to

70

submit claims to federal healthcare programs for such medically unnecessary therapy.

237. Life Care's scheme to defraud the government included providing excessive and unnecessary therapies to patients. It also included adding to patients' admissions orders therapies, most commonly speech therapy, for which there was no order from the hospital physician and for which there was no supporting diagnosis, and forcing patients, many of whom were very old, or very sick, or both, to undergo therapy that was either medically unnecessary in the first instance, or that was excessive in frequency, duration, and intensity, and was often harmful to the patients. Compliance with these applicable laws and regulations referred to above was and is material to the Government's payment of claims for SNF services.

238. In many instances, Life Care documented the provision of therapy for patients who were too sick or too frail to have withstood the therapy. In these cases, the therapy either could not possibly have been provided at all, or any therapy that was provided was not skilled.

### 1. Specific Examples of Patients who Received Unnecessary or Excessive Therapy

*Patient U*

239. Patient U was an 86-year-old Medicare patient admitted to LCCH on March 2, 2019 following a right hip replacement. Palliative care was recommended as her diagnoses included breast cancer, pneumonia, congestive heart failure, and

71

hallucinations. Patient U was discharged from the hospital with an order for a PT and OT evaluation. Upon admission to LCCH, ST was added.

240.   Patient U was weak, had low appetite, was only able to sit in a wheelchair for short periods of time, needed assistance dressing, and was incontinent of the bowel and bladder. Despite these severe limitations, in just over a two-week period between March 2, 2019 and March 18, 2019, the date of her last therapy session, Patient U received a total of 1844 therapy minutes, including 357 minutes of ST; 560 minutes of OT; and 927 minutes of PT. Given her condition, it is unlikely that Patient U could have withstood or completed the number of therapy minutes recorded, which suggests falsification of records.

241.   Patient U was admitted to hospice care on March 19, 2019, and died just over 24 hours later, on March 20, 2019.

*Patient V*

242.   Patient V was a 98-year-old Medicare patient admitted to LCCH on December 23, 2018 with rhabdomyolysis and dementia. Patient V's hospital discharge orders included PT and OT evaluation and treatment.  Between December 24, 2018 and February 6, 2019, Patient V received 4,980 total minutes of therapy, including 2,099 minutes of PT; 1,671 minutes of OT; and 1,210 of ST.  Given her physical condition and dementia, it is unlikely Patient V could have withstood or

72

completed the number of therapy minutes recorded, which suggests falsification of records.

243. On February 7, 2019, Patient V was moved to hospice care, and died on February 15, 2019.

*Patient W*

244. Patient W is an 89-year-old Medicare patient who was admitted to LCCH February 27, 2019 following back surgery. Patient W's diagnoses included lumbar fracture, Parkinson's disease, and prostate cancer. His hospital records showed that after having a stroke on February 21, 2019, he was not following commands and was nonverbal, and that on February 23, 2019, he was "waxing and waning," not following commands, and was nonverbal. A palliative care consult performed on February 25, 2019, indicated that Patient W's "survival estimate was on the order of weeks, likely not greater than 1-3 weeks and almost certainly not greater than 1-6 months, particularly given the significant likelihood of return to any meaningful level of function given his expected long postop recovery, his debilitated state, and multiple comorbidities, particularly the Parkinson [sic] disease. If the patient did poorly in his rehab effort, hospice would be recommended as the most realistic and compassionate plan of care."

245. Upon admission to LCCH, PT, OT, and ST were ordered. During the two-week period from February 27 to March 13, 2019, when Patient W was admitted

73

to hospice, he received a total of 1,215 minutes of therapy, including 350 minutes of ST; 422 minutes of OT; and 443 minutes of PT. Given Patient W's condition, it is unlikely he could have withstood or completed the number of therapy minutes recorded.

*Patient X*

246.   Patient X is a 71-year-old Medicare patient who was admitted to LCCH on January 8, 2019 with chronic respiratory failure. Patient X used oxygen 24/7 and was short of breath on a near-constant basis. PT and OT evaluations were ordered at the time of discharge from the hospital. Upon admission to LCCH, speech therapy was added.

247.   Patient X's cardiologist documented in office notes that, "According to the patient they do not let her participate in physical therapy on a consistent basis due to either hypotension or tachycardia." Patient X's Life Care records show, however, that she was seen five times a week by both PT and OT, and that her sessions ranged from 19 minutes to 77 minutes, with an average of 55-60 minutes per therapy session. These records are inconsistent with Patient X's statements to her cardiologist.

248.   On several occasions, PT and OT noted that "[Patient X] was too weak to participate in therapy." It was also documented that Patient X's blood pressure and pulse were too elevated for her to participate in therapy.  Nevertheless, Patient

74

X's records reflect that she received a total of 1521 minutes of PT and 1258 minutes of OT.

*Patient Y*

249.   Patient Y was a 91-year-old Medicare patient admitted to LCCH on February 13, 2019 with respiratory failure with hypoxia. At the time of admission, Patient Y was weak and in general discomfort. He was on oxygen, two liters per minute, via nasal cannula, and required a two-person assist with transfers. Patient Y's hospital discharge orders included PT and OT evaluations and treatment.

250.   On February 14, 2019, Patient Y's nursing notes charted that Patient Y was "congested, doing poorly, yells out for help." That same day, PT documented a 132-minute evaluation, 55 minutes of therapy, and 41 minutes of co-treatment. OT documented a 101-minute evaluation, 66 minutes of therapy, and 41 minutes of co-treatment.

251.   On February 18, 2019, Patient Y's nursing notes charted that Patient Y had left lower lobe pneumonia. The notes further indicated that Patient Y's family was present, that a Hoyer lift was being used for transfers, and that Patient Y was showing a decrease in meal intake. That same day, PT documented 66 minutes of therapy, OT documented 46 minutes of therapy, and ST documented 39 minutes of therapy.

252.   On February 22, 2019, Patient Y was admitted to hospice. Prior to being admitted to hospice, Patient Y received 83 minutes of PT, 59 minutes of OT; 34 and 53 minutes of ST; and 49 minutes of PT and OT co-treatment, on February 20, 2019, and he received 60 minutes of PT, 59 minutes of OT, and 29 minutes of ST, on February 21, 2019. Patient Y is documented as having received 30 minutes of ST on the day he was admitted to hospice.

253.   On February 23, 2019, speech therapy documented that it provided 33 minutes of therapy, even though Patient Y was on hospice services.

254.   Patient Y was moved to LCCH's long-term care unit on February 25, 2019, and died two days later, on February 27, 2019.

255.   In total, Patient Y received 1,520 minutes of therapy in the ten-day period between February 13 and February 23, 2019. Given Patient Y's physical condition, it is unlikely he could have withstood or completed the number of therapy minutes recorded.

*Patient Z*

256.   Patient Z is a 76-year-old Medicare patient who was admitted to LCCH on December 27, 2018, discharged on January 6, 2019, and readmitted on January 10, 2019. Patient Z is a bilateral above-the-knee amputee with approximately six inches of leg stump and no leg braces. Patient Z lives alone, uses an electric scooter, and is independent with his personal care.

76

257.    Upon both admissions to LCCH, PT and OT were ordered for Patient Z. Patient Z received PT six times a week for four weeks and OT five times a week for four weeks. Because Patient Z is wheelchair-bound, the therapies he received in PT and OT were identical and duplicative.

### C.    Defendant Life Care Provided Worthless and/or Substantially Diminished Services to its Residents

258.    At all times relevant hereto, Defendant Life Care had a duty to provide services that met regulatory requirements aimed at ensuring its residents received "the highest practicable level of physical, mental, and psychosocial well-being [of] every resident." 42 U.S.C. § 1396r(b)(2)(A). Compliance with these duties requires the provision of a safe and sanitary living environment; adequate services and supplies to meet residents' basic nutrition and hygiene requirements; and qualified and adequate nursing staff, among others.

259.    Notwithstanding these duties, the care and services Defendants provided to residents at Life Care facilities was so deficient, inadequate, and substandard as to constitute worthless or substantially diminished services in violation of state and federal statutes, regulations, and contractual provisions, compliance with which is material to the Government's decision to pay claims for those services.

260.    Defendant Life Care knew, should have known, or acted in reckless disregard of the fact that residents of its facilities were subjected to unreasonable

77

risks of physical and psychological harm as a result of its neglect and diminished or substandard services.

261.  At all times relevant hereto, Life Care's failure of care in violation of the FCA includes, but is not limited to, the following:

- **<u>Lack of Adequate Nursing Staff</u>:** Life Care has consistently failed to provide adequate staff to meet its residents' needs.  To illustrate, LCCH has been staffed with only one RN, three LPNs, and five CNAs for approximately 76 patients, 4 of whom were wanderers who required one-to-one care. This left only 9 nursing staff members to care for the remaining 72 patients. It is also common for Life Care to remove either a CNA or a nurse off the schedule at 10 p.m.

- **<u>Failure to Monitor and Prevent Elopement and Wandering</u>:** Life Care facilities, including LCCH, are not equipped to protect wanderers, elopers, and patients with dementia. Life Care has taken little or no steps to protect wandering residents from hazards, in violation of Medicare requirements. <u>See</u> 42 C.F.R. § 483.25(d)(1)-(2) (requiring that the resident environment remain as free of accident hazards as is possible and that each resident received adequate supervision and assistance devices to prevent accidents). Life Care has also taken no steps to protect other residents from wandering patients.

78

- **Failure to Provide Items and Supplies to Meet Basic Resident Needs:** Life Care has failed to provide essential items to meet the basic needs of its residents. For example, LCCH has experienced a chronic lack of necessary supplies, ranging from PIC system medications; glucose strips for diabetics; urinals; medicine cups for pills; and nighttime snacks for diabetics.

## D. Forrest Preston is Liable as Life Care's Alter Ego for Life Care's Violations

262. Preston is the founder, sole shareholder, and Chairman of the Board of Life Care Centers of America.

263. Life Care is organized as an "S-Corporation" under the Internal Revenue Code. All of Life Care's income and losses are therefore reported on Preston's personal tax returns and are taxed to Preston (rather than at a corporate level).

264. Preston also owns and controls, either in whole or in part, most of the nursing home facilities throughout the United States that are managed by Life Care. Preston either owns the nursing home facilities directly, through Life Care, or through partnerships that he owns in whole (e.g., Life Care Affiliates II Limited Partnership) ("LCAII"), or in part.

265.   Regardless of the particular ownership structure, Life Care Centers of America manages and/or operates all of Preston's Life Care facilities and charges those facilities a management fee for its services.

266.   Medicare paid Life Care and its facilities over $4.6 billion from January 2010 through February 2016 for services rendered by Life Care skilled nursing facilities.

267.   During the relevant time period, Preston was the ultimate financial beneficiary of the majority of revenues billed and collected, including Medicare funds, by Life Care and its affiliated nursing home facilities. As such, Preston benefitted from Life Care's submission of false claims and claims for which Life Care was not entitled to reimbursement from Medicare.

268.   Preston also operated Life Care and its related entities without regard for the separateness between himself and the corporate forms among the entities. As Preston himself explained in a deposition in another case, "a benefit to me is the corporation. That's synonymous … if you have two pockets in your pants and you move the money from one pocket to the other, do you still have the money? Which gained? Which lost? I don't understand. If you don't understand sub S, that's all that really amounts to is moving your own money from your own trousers from one pocket to the other."

269. Preston has asserted in tax-related litigation that Life Care, LCA II, the hundreds of Life Care facilities he owns, his partnerships, or other corporate entities that he owns, are all part of a single unitary nursing home business. Preston has taken this position in order to leverage losses sustained by parts of his business when calculating his personal tax liability and, thereby, reduce the amount of taxes owed.

270. For example, in support of his position that his nursing home business was a "unitary business," Preston, through counsel, represented in a December 14, 2005, letter to the Michigan Department of Treasury, Office of Hearings that:

- Mr. Preston's nursing home business is one unitary business . . . Each entity that makes up the unitary business group was obviously involved in the same line of business, the nursing home business. The key officers and directors and partners of the members of the business group were interlocking and largely identical, and these key people managed the business activities of each member of the unitary business group.

- [Life Care] maintains a centralized financial reporting system managed by an experienced finance staff which aids in the administration of all of [Preston's] nursing homes and also provides a thorough and uniform report to [Life Care] senior management, including monthly profit and loss statements, which permits close supervision and timely monitoring of the operating results of all such homes by [Life Care] senior management. All general ledgers and financial statements for all of [Preston's] nursing homes and retirement centers are processed at [Life Care's] corporate offices in Cleveland, Tennessee. The budgeting process and the preparation of all tax returns for all of [Preston's] nursing homes and retirement centers are coordinated at [Life Care's] corporate offices in Cleveland, Tennessee. All expenditures over a pre-determined amount by any of [Preston's] nursing homes must be approved by [Life Care] personnel in Cleveland, Tennessee.

81

- The treasury function of [Preston's] nursing home business is centralized. All borrowing and other financing activities for all aspects of the [Preston's] business are negotiated by and entered into by [Life Care] personnel in Cleveland. And during the years in issue, [Life Care] had guaranteed the repayment of well over $100,000,000 of borrowings by [Preston] and other entities owned by [Preston] with respect to the nursing home business. There is no question that lenders viewed [Preston's] nursing home business as a whole, single entity.

271. Preston's control over his unitary nursing home business allowed him to secure significant loans on behalf of Life Care and his other businesses. For example, Life Care and dozens of other Preston owned entities borrowed hundreds of millions of dollars from GE Capital in December 2010. The loan documents expressly recognized that Life Care had the ability to control the actions of the facilities and that Preston was the ultimate authority with respect to all material business decisions of the various borrower entities.

272. Preston has also asserted (both in state tax related litigation and to the Internal Revenue Service) that he materially participates on a regular, continuous and substantial basis in the operations of his unitary nursing home business, and that he "is an active manager of his nursing home business." This assertion has allowed Preston to further reduce his tax liability by offsetting losses against the income he receives from his unitary nursing home business.

273. Preston's control over Life Care is reflected in the company by-laws, under which he has the sole authority to appoint and remove any member of Life

Care's Board of Directors without cause and to amend the corporation's by-laws at will. The by-laws further provide him with the unilateral power to remove all other directors, thereby allowing his sole vote to constitute a quorum of the Directors to overturn any decision with which he disagrees.

274.   Preston has further controlled Life Care and its operations by filling open positions on the Board with his personal friends and advisors, and at times, even his administrative staff. Preston restricted who could speak directly to the Board and what information individuals were allowed to share with the Board. Preston required materials to be filtered through him before being shared with the Board, and executives were not allowed to speak at Board meetings unless called on by Preston directly. Through his actions, Preston dominated Life Care and restricted the Board's ability to adequately manage and oversee the company.

275.   Preston also failed to respect corporate formalities and operated Life Care as an instrumentality of his own affairs.

276.   Preston utilized Life Care employees to conduct his personal business including, but not limited to, preparing his personal financial records and tax returns. Preston has also used and directed Life Care employees to conduct the business of his related entities, and has operated numerous other business entities that he owns or controls from the same business address as Life Care.

277.   Preston also borrowed money from Life Care under the guise of loans. As of 2009, Life Care had loaned Preston more than $50 million. At times, these loans were not approved by the Board and had no set repayment terms. Moreover, Life Care did not always secure collateral or other security from Preston.

278.   Life Care, at times through Preston as CEO and Chairman of the Board, has written off fees or debts owed by entities owned or controlled by Preston. For example, on several occasions Life Care reduced the management fee owed to Life Care by Preston-owned facilities. Preston also directed Life Care to provide guarantees for Preston's personal third-party debts, which the Board did not review or approve.

279.   As a result of Preston's actions, Preston has left Life Care severely undercapitalized while simultaneously receiving significant tax benefits as result. Preston owns and manages the Life Care unitary nursing home business to which Medicare has paid billions of dollars, a substantial portion of which were for medically unreasonable and unnecessary rehabilitation therapy services. Given Preston's control over the operations of the Life Care unitary business, given his knowledge of concerns raised by Life Care employees about the conduct at issue in this case, and given that he was personally enriched through his Life Care unitary business while leaving the company grossly undercapitalized, he should be regarded as the alter ego of Life Care, and should not be able to retain the proceeds of Life

84

Care's false claims. Thus, Forrest Preston was unjustly enriched at the expense of the United States in such amounts as may be determined at trial. Moreover, Preston and related person/entities hold all such proceeds (including property obtained with these proceeds) in constructive trust for the benefit of the United States; and all such proceeds and property are impressed with an equitable lien for the benefit of the United States. The United States is also entitled to seek injunctive relief to preserve the funds and property in question as may be appropriate.

## COUNT ONE

## FEDERAL FALSE CLAIMS ACT

280.    Relators repeat and reallege paragraphs 1 through 279 as if fully set forth herein.

281.    Defendants, through their material false statements, non-disclosures, and other wrongful acts and omissions set forth above, violated the following provisions of the Federal False Claims Act, in that they:

> (1) knowingly presented or caused to be presented numerous false claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A);

> (2) knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B);

85

(3) knowingly had in their possession, custody or control property or money used, or to be used, by the Government and knowingly delivered, or caused to be delivered, less than all of that money or property in violation of 31 U.S.C. § 3729(a)(1)(D);

(4) knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G);

(5) knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G); and

(6) conspired to commit the violations of the False Claims Act described herein.

282. As a result of Defendants' violations of 31 U.S.C. § 3729, the United States is entitled to recover treble damages, civil penalties, and all other relief authorized by law from Defendants.

## COUNT TWO

**CALIFORNIA FALSE CLAIMS ACT,
CAL. GOV'T CODE § 12650, ET SEQ.**

283.    Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

284.    Relators also bring this action on behalf of the State of California, against Defendants under the California False Claims Act, Cal. Gov't Code § 12652(c).

285.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(1), which creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

286.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

287.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(7), which creates liability for any person who

87

"[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision."

288.    Pursuant to the California FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Cal. Gov't Code § 12651(a)(1).

## COUNT THREE

### COLORADO MEDICAID FALSE CLAIMS ACT,<br>COLO. REV. STAT. § 25.5-4-303.5, ET SEQ.

289.    Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

290.    Relators also bring this action in the name of the State of Colorado, against Defendants pursuant to the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306.

291.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305(1)(a), which creates liability for any person who

"[k]nowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval."

292.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305(1)(b), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

293.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305(1)(f), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act,' or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act.'"

294.   Pursuant to the Colorado FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Colo. Rev. Stat. § 25.5-4-305(1).

89

## COUNT FOUR

## FLORIDA FALSE CLAIMS ACT,
## FLA. STAT. § 68.081, ET SEQ.

295.    Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

296.    Relators also bring this action on behalf of the State of Florida, against Defendants under the State of Florida's False Claims Act, Fla. Stat.

§ 68.083(2).

297.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(a), which creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

298.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(b), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

299.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(g), which creates liability for any person who "[k]nowingly makes,

90

uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

300.     Pursuant to the Florida FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Fla. Stat. § 68.082(2).

## COUNT FIVE

### GEORGIA STATE FALSE MEDICAID CLAIMS ACT, O.C.G.A. § 49-4-168, ET SEQ.

301.     Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

302.     Relators also bring this action in the name of the State of Georgia, against Defendants pursuant to the State of Georgia False Medicaid Claims Act ("FMCA"), O.C.G.A. § 49-4-168 et seq.

303.     Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(1), which creates liability for any person who "[k]nowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval."

91

304. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

305. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(7), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program."

306. Pursuant to the Georgia FMCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, DEFENDANTS are liable to the State for treble damages, civil penalties, and all other relief authorized by law. O.C.G.A. § 49-4-168.1(a).

## COUNT SIX

### HAWAII FALSE CLAIMS ACT,
### HAW. REV. STAT. § 661-21, ET SEQ.

307.   Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

308.    Relators also bring this action on behalf of the State of Hawaii and its political subdivisions, against Defendants under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-25(a).

309.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of The Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(l), which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

310.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

311.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(6), which creates liability for any person who "[k]nowingly

93

makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

312.   Pursuant to the Hawaii FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Haw. Rev. Stat. § 661-21(a).

## COUNT SEVEN

### INDIANA MEDICAID FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, IND. CODE § 5-11-5.7, ET SEQ.

313.   Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

314.   Relators also bring this action on behalf of the State of Indiana, against Defendants under the State of Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.7-4(a).

315.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(l), creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

94

316.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(2), creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim."

317.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(6)(A)-(B), which creates liability for any person who "(A) makes, uses, or causes to be made or used, a false record or statement concerning an obligation to pay or transmit money or property to the state; or (B) conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

318.    Pursuant to the Indiana FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Ind. Code § 5-11-5.5-2(b).

## COUNT EIGHT

### THE COMMONWEALTH OF MASSACHUSETTS FALSE CLAIMS ACT, MASS. ANN. LAWS CH. 12, § 5A, ET SEQ.

319.    Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

95

320.    Relators also bring this action on behalf of the Commonwealth of Massachusetts, against Defendants under the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5C(2).

321.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(1), which creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

322.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(2), creates liability for any person who "knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim."

323.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(9), which creates liability for any person who "knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or

96

knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof."

324. Pursuant to the Massachusetts FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mass. Ann. Laws ch. 12, § 5B(a).

## COUNT NINE

### MICHIGAN MEDICAID FALSE CLAIMS ACT, MICH. COMP. LAWS SERV. § 400.601, ET SEQ.

325. Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

326. Relators also bring this action in the name of the State of Michigan, against Defendants under the State of Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.610a(l).

327. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Michigan FCA, Mich. Comp. Laws Serv. § 400.603(1)-(3):

"(1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for medicaid benefits.

(2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a medicaid benefit.

97

(3)     A person, who having knowledge of the occurrence of an event affecting his initial or continued right to receive a medicaid benefit or the initial or continued right of any other person on whose behalf he has applied for or is receiving a benefit, shall not conceal or fail to disclose that event with intent to obtain a benefit to which the person or any other person is not entitled or in an amount greater than that to which the person or any other person is entitled."

328.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Michigan FCA, Mich. Comp. Laws Serv. § 400.607(1), which states that "[a] person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false."

329.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Michigan FCA, Mich. Comp. Laws Serv. § 400.607(3), which states that "[a] person shall not knowingly make, use, or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the social welfare act."

330.    Pursuant to the Michigan FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mich. Comp. Laws. Serv. § 400.612.

98

## COUNT TEN

## NEVADA SUBMISSION OF FALSE CLAIMS TO
## STATE OR LOCAL GOVERNMENT ACT,
## NEV. REV. STAT. § 357.010, ET SEQ.

331.   Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

332.   Relators also bring this action on behalf of the State of Nevada, against Defendants under the State of Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. § 357.080(1).

333.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Nevada FCA, Nev. Rev. Stat. § 357.040(l), which create liability for any person who:

"(a)   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(b)   Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim.
…

(f)   Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision[; or]

(g)   Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision.

334.    Pursuant to the Nevada FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Nev. Rev. Stat. § 357.040(2).

## COUNT ELEVEN

### NEW MEXICO MEDICAID FALSE CLAIMS ACT, N.M. STAT. ANN. § 27-14-1, ET SEQ.

335.    Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

336.    RELATORS also bring this action on behalf of the State of New Mexico, against Defendants under the State of New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-7.B.

337.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the New Mexico FCA, N.M. Stat. Ann. § 27-14-4, which create liability for any person who:

"A.    presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing that such claim is false or fraudulent;

B.    presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing that the person receiving a medicaid benefit or payment is not authorized or is not eligible for a benefit under the medicaid program;

C.     makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the medicaid program paid for or approved by the state knowing such record or statement is false; [or]

…

E.     makes, uses or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the medicaid program, knowing that such record or statement is false."

338.   Pursuant to the New Mexico FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and such other relief as authorized. N.M. Stat. Ann. § 27-14-4.

## COUNT TWELVE

### NORTH CAROLINA FALSE CLAIMS ACT, N.C. GEN. STAT. § 1-605, ET SEQ.

339.   Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

340.   Relators also bring this action on behalf of the State of North Carolina, against DEFENDANTS under the State of North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

341.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the

101

North Carolina FCA, N.C. Gen. Stat. § 1-607(a), which create liability for any person who:

"(1)    Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

…

(7)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

342.    Pursuant to the North Carolina FCA, based on Defendants material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.C. Gen. Stat. § 1-607(a).

## COUNT THIRTEEN

## RHODE ISLAND FALSE CLAIMS ACT,
## R.I. GEN. LAWS § 9-1.1-1, ET SEQ.

343.    Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

344.    Relators also bring this action in the name of the State of Rhode Island, against Defendants pursuant to the State of Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-4(b).

102

345. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Rhode Island FCA, R.I. Gen. Laws § 9-1.1-3(a), which create liability for any person who:

"(1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

…

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state…."

346. Pursuant to the Rhode Island FCA, based on Defendants material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. R.I. Gen. Laws § 9-1.1-3(a).

## COUNT FOURTEEN

### TENNESSEE MEDICAID FALSE CLAIMS ACT,
### TENN. CODE ANN. § 71-5-181, ET SEQ.

347. Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

348. Relators also bring this action in the name of the State of Tennessee, against Defendants under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b)(1) ("Tennessee FCA").

349. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Tennessee FCA, Tenn. Code Ann. § 71-5-182(a)(l), which create liability for any person who:

"(A) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the medicaid program;

(B) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the medicaid program; [or]

(C) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the medicaid program."

350. Pursuant to the Tennessee FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are

liable to the State for treble damages, civil penalties, and all other relief authorized by law. Tenn. Code Ann. § 71-5-182(a).

## COUNT FIFTEEN

### TEXAS MEDICAID FRAUD PREVENTION ACT, TEX. HUM. RES. CODE § 36.001, ET SEQ.

351.   Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

352.   Relators also bring this action in the name of the State of Texas, against Defendants under the State of Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.101(a).

353.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Texas FCA, Tex. Hum. Res. Code § 36.002, which create liability for any person who, *inter alia*:

> "(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;
>
> (2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;
>
> (3) knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;

…

(12)   knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

(13)   knowingly engages in conduct that constitutes a violation under Section 32.039(b)."

354.   Pursuant to the Texas FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Tex. Hum. Res. Code § 36.052.

## COUNT SIXTEEN

**THE COMMONWEALTH OF VIRGINIA
FRAUD AGAINST TAXPAYERS ACT,
VA. CODE ANN. § 8.01-216.1, ET SEQ.**

355.   Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

356.   Relators also bring this action on behalf of the Commonwealth of Virginia, against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

357.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the

106

Virginia FCA, Va. Code Ann. § 8.01-216.3(A), which create liability for any person who:

"1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

2. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

…

7. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth."

358. Pursuant to the Virginia FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Va. Code Ann. § 8.01-216.3(A).

## COUNT SEVENTEEN

## WASHINGTON STATE MEDICAID FRAUD FALSE CLAIMS ACT, WASH. REV. CODE § 74.66.005, ET SEQ.

359. Relators incorporate by reference the preceding paragraphs as if they were fully set forth herein.

360.   Relators also bring this action on behalf of the State of Washington, against Defendants under the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.050(1).

361.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Washington FCA, Wash. Rev. Code § 74.66.020(1), which create liability for any person who:

"(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

…

(g)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity."

362.   Pursuant to the Washington FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Wash. Rev. Code § 74.66.020(1).

# PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of themselves and the United States, and pray:

(a)  That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of between $5,500 and $11,000 for each violation of the Federal False Claims Act before November 2, 2015, and $11,463 to $22,927 for each violation after November 2, 2015;

(b)  That the Court enter judgment against Defendants in favor of the States and the Relator in the amount of the damages sustained by the States, trebled as provided for in the State FCAs, plus civil penalties for each violation of each of the States' FCAs;

(c)  That Relators be awarded an amount that the Court decides is reasonable for recovering the proceeds of the action, including but not necessarily limited to the civil penalties and damages, on behalf of the United States, which, pursuant to the False Claims Act, shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the government intervenes and proceeds with the action, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the government does not intervene;

(d)     That the Relators be awarded an amount from the proceeds of the action to the States as provided for in the *qui tam* provisions of each of the individual States' false claims acts;

(e)     That the Relators be awarded an amount from the proceeds of any alternate remedy pursued or obtained by the United States, in any alternate proceeding to this action, pursuant to the alternate remedy provisions of the Federal False Claims Act, 31 U.S.C. § 3730(c)(5);

(f)     That Relators be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(g)     That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

Respectfully submitted,

/s/ Patrick Barrett
Patrick Barrett (BPR #020394)
Barrett Law Office, PLLC
4205 Hillsboro Pike
Suite 303
Nashville, TN  37215
(615) 463-4000
pbarrett@barrettlawofficetn.com

Michael A. Sullivan
Georgia Bar No. 691431
Emma R. Cecil
Georgia Bar No. 076181
Finch McCranie, LLP
225 Peachtree St., NE
Suite 1700
Atlanta, GA  30303
(404) 658-9070
msullivan@finchmccranie.com
ececil@finchmccranie.com

Counsel for Plaintiff-Relators